ACCEPTED
03-14-00774-CV
7945029
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/23/2015 11:04:41 AM
JEFFREY D. KYLE
CLERK

NO. 03-14-00774-CV

IN THE THIRD COURT OF APPEALS
AT AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
11/23/2015 11:04:41 AM
JEFFREY D. KYLE
Clerk

TEXAS STATE BOARD OF VETERINARY MEDICAL EXAMINERS, and
NICOLE ORIA, in her Official Capacity as Executive Director,
*Appellants/Cross-Appellees*,

v.

ELLEN JEFFERSON, D.V.M.,
*Appellee/Cross-Appellant.*

On Appeal from the 127th Judicial District Court of Travis County, Texas
Cause No. D-1-GN-14-000287
The Honorable Gisela D. Triana presiding

APPELLEE/CROSS-APPELLANT'S RESPONSE TO
THE TBVME'S SUGGESTION OF MOOTNESS

TO THE HONORABLE JUSTICES OF THE THIRD COURT OF APPEALS:

Ellen Jefferson, D.V.M., submits this response to Appellants'/Cross-Appellees' Suggestion of Mootness, respectfully requesting that the Court reject this tactical and tardy effort by Texas Board of Veterinary Medical Examiners' (the **TBVME** or the **Board**) and its Executive Director (**Oria**) to avoid judicial review of the three-year *ultra vires* enforcement campaign they have waged against her.

1

## INTRODUCTION

Having recently dismissed charges against Dr. Jefferson, the TBVME maintains that Dr. Jefferson's cross-appeal should be dismissed as moot, while the Board's own appeal continues.[1] But this Court has made clear that declaratory judgment claims, such as those that are subject of Dr. Jefferson's cross-appeal, are "*not* moot when a party voluntarily abandons the conduct at issue without any *binding admission or extrajudicial action that would prevent a recurrence of the challenged action.*"[2]

As Dr. Jefferson will recount below, the Board steadfastly refuses to cross this line of no return. Three years, two trials, and one appeal into the contest, the Board presumes it enjoys the prerogative to call a Mulligan on the whole match. But the Board's procedures for starting the contest all over again—including the appeal it is prosecuting—mean this controversy is no less "live."[3] Indeed, instead of mootness, what the Board's recent actions demonstrate is the legitimacy and necessity of her declaratory judgment claims.

Dr. Jefferson therefore respectfully requests that the Court reject the TBVME's suggestion of mootness and proceed to the merits of the case.

---

[1]  *See* Appellants'/Cross-Appellees' Suggestion of Mootness at 3 (Nov. 5, 2015) (**TBVME's Suggestion of Mootness**).

[2]  *Bexar Metro Water Dist. v. City of Bulverde*, 234 S.W.3d 126, 131 (Tex. App.—Austin 2007, pet. denied) (internal quotations omitted) (emphasis added).

[3]  *Id.*

STATEMENT OF THE CASE

## A. The TBVME and the Fractious Relationship between Traditional Clinical Veterinarians and Shelter Practitioners

The TBVME is made up of nine members, six practicing veterinarians and "three members who represent the public" (currently two lawyers and a rancher/real estate broker).[4] Like other professional boards, the TBVME is not subject to active supervision by any independent state agency. As the United States Supreme Court recently observed, even when such boards' intentions are earnest, there is a "structural risk of market participants' confusing their own interests with the State's policy goals."[5]

Although it is self-evident that euthanizing greater numbers of dogs and cats will not improve the profession's demand curve, many clinical veterinarians grumble about shelters generally and no-kill shelters especially.[6] A survey in 2012 found that 54 percent believe shelters compete with them and only 41 percent support shelters.[7]

---

[4]    TEX. OCC. CODE § 801.051.

[5]    *North Carolina State Board of Medical Examiners v. FTC*, ___ U.S. ___, 113 S Ct. 1101, 1114, 191 L. Ed. 2d 35 (2015); *see also id.* ("[w]hen a State empowers a group of active market participants to decide who can participate in its market, and on what terms, the need for supervision is manifest."); *Teledoc, Inc. v. Texas Medical Board*, 453 S.W.3d 606, 622 (Tex. App.—Austin 2014, pet. filed) (the relevant concern under our Constitution and laws "is the risk that agencies—whose legitimate authority and very existence must derive from law and not merely perceived "expediency"—will stray from their legal limitations (perhaps with the best of individual intentions, but exceeding them nevertheless) through what federal courts have aptly termed a "tyranny of small decisions" that substantively assert Executive or Legislative power over the citizenry through forms calculated to avoid the meaningful checks and balances the Framers intended the Judiciary to provide.").

[6]    *See, e.g.*, Kristi Reimer, Editor, *The War between Shelters, Veterinarians Needs to End*, Nov. 1, 2014, DVM360 Magazine.

**B.      Two Brief Points about the Owner Exemption and Chapter 828 of the Texas Health and Safety Code**

Dr. Jefferson's merits briefs explain the owner exemption, which is at the center of this litigation, and she will not burden the record by revisiting the subject here except to point out that her reliance on it was merely in keeping with the widely-held view that it is a regulatory safe harbor for shelters.[8]

In Texas, the Legislature attempted to even more clearly stake out territory for shelter veterinarians while protecting clinical practitioners' traditional market. Chapter 828 of the Health and Safety Code, which governs the operations of "releasing agencies" (shelters placing pets for adoption),[9] spells out the work veterinarians *must do* as well as the work they *cannot do*:

---

[7]      *See* Brendan Howard, *Shelters and Veterinarians: The Problem with Cats*, VET. ECON., Jan. 1, 2013), *available at* http://veterinarybusiness. dvm360.com/(last visited Nov. 19, 2015).

[8]      *See, e.g.,* LILA MILLER AND STEPHEN ZAWISTOWSKI, SHELTER MEDICINE FOR VETERINARIANS AND STAFF at 65 (2d ed. 2013) ("[m]any, if not every state's practice act has [such] an exemption for owners of animals."); AVMA MODEL VET. PRAC. ACT § 6(9), cmt. to section 6 (2013) (exempting care or treatment by "an owner of an animal and any of the owner's regular employees" and noting that the exemption "has been a common practice for states").

[9]      TEX. HEALTH AND SAFETY CODE § 828.001(2) ("'Releasing agency' means a public or private animal pound, shelter, or humane organization. The term does not include an individual who occasionally renders humane assistance or shelter in the individual's home to a dog or cat."), *id.* § 828.002 ("Except as provided by Section 828.013, a releasing agency may not release a dog or cat for adoption unless the animal has been sterilized or the release is made to a new owner who signs an agreement to have the animal sterilized."); *id.* § 828.013 ("This chapter does not apply to: (1) a dog or cat that is claimed from a releasing agency by a person who already owns the animal; (2) a releasing agency located in a municipality that has in effect an ordinance providing standards for dog and cat sterilization that exceed the requirements provided by this chapter; (3) an institution of higher education that purchases or otherwise procures a dog or cat for the purpose of biomedical research, testing, or teaching; or (4) a releasing agency located in: (A) a county with a population of 20,000 or less; or (B) a municipality with a population of 10,000 or less.").

Sec. 828.012.  SURGERY AND OTHER VETERINARY SERVICES.

(a)  Surgery or nonsurgical sterilization performed in accordance with this chapter must be performed by a veterinarian or a full-time student of an accredited college of veterinary medicine as provided by Chapter 801, Occupations Code.

(b)  A veterinarian employed by a releasing agency may not perform nonemergency veterinary services other than sterilization on an animal that the releasing agency knows or should know has an owner. However, this subsection does not prevent a veterinarian employed by a releasing agency from performing veterinary services on an animal whose owner is indigent.[10]

## C.    The Board on the Owner Exemption and Dr. Jefferson—the Before and After Picture

According to the Board, events in the underlying administrative proceeding subsequent to "the filing of Dr. Jefferson's cross-appeal" prompted it to drop charges against Dr. Jefferson.[11] But the cited events shed no light on the Board's timing or reasons. To be sure, there was a mediation, but it did not produce a settlement, and the administrative judge did make a preliminary ruling in Dr. Jefferson's favor, but that decision was issued some eight months before the Board's dismissal of charges and suggestion of mootness (and five months prior to the parties' merits briefs).[12]

What is clear is that the Board's position on jurisdiction over Dr. Jefferson remains unchanged. Eight months after the ALJ's decision, the Board filed its Self-

---

[10]    *Id.* § 828.001(2)(a) & (b); *see also id.* § 828.001(2)(c) ("A person associated with a releasing agency may not interfere with the independent professional judgment of a veterinarian employed by or under contract with the releasing agency.").

[11]    TBVME's Suggestion of Mootness ¶¶ 2-3.

[12]    Compare *id.* *with* **Exhibit D** to the TBVME's Suggestion of Mootness.

Evaluation Report with the Texas Sunset Commission (**Exhibit A** hereto).[13] In that report, which is now undergoing review by the Sunset Commission Staff, the Board repeatedly takes issue with shelters, Dr. Jefferson, and the ALJ's preliminary ruling,[14] and between scathing accounts of the now-dismissed charges against her, the Board makes its position on jurisdiction over her shelter work clear:

> The Board's position is that Dr. Jefferson, as a licensed veterinarian who is practicing veterinary medicine on animals, is regulated by the Board and subject to the standard of care requirements.[15]

Just as the Board claims jurisdiction over her Dr. Jefferson's shelter work before the Sunset Commission, it has never retreated from that position in the SOAH proceedings or before this Court, much less made a "binding admission" that Dr. Jefferson's work falls within the owner exemption.[16]

Nor has the TBVME taken any "extrajudicial action that would prevent a recurrence of the challenged action."[17] The day after the Board filed its suggestion of mootness, Dr. Jefferson wrote to point out the need for such a measure and propose mutual covenants regarding her SAPA work, a draft of which she provided (**Exhibit**

---

[13]     *See* Texas Board of Veterinary Medical Examiners Self-Evaluation Report, September 2015, *available at* http://www.veterinary.texas.gov/news.php (last visited Nov. 21, 2015).

[14]     *Id.* at 7-8, 39-40, and 48-49.

[15]     *Id.* at 9 (highlighting added).

[16]     *Bulverde*, 234 S.W.3d at 131 (internal quotations omitted).

[17]     *Id.* (internal quotations omitted).

**B** hereto).[18] The Board declined to explore mutually agreeable terms, and it did not propose any alternative "extrajudicial action" in their stead (**Exhibit C**).[19]

Dr. Jefferson also pointed out the Board's pending investigation of another SAPA veterinarian, and the fact that many of the Board's prior charges against Dr. Jefferson were based on the supposed acts of a subordinate veterinary professional at SAPA (**Exhibit D**).[20] That investigation has not been dropped. And, although the Board professes to have closed two investigations against Dr. Jefferson "due to lack of evidence,"[21] there is nothing in the Board's enabling act or rules that prohibits it from reversing tack and pursuing those matters.

## ARGUMENT AND AUTHORITY

In a declaratory judgment action, the standard for determining whether a defendant's voluntary conduct has mooted a case is "stringent"—the defendant must show it is "'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'"[22] The United States Supreme Court has explained this heavy

---

[18] Letter from David P. Blanke, Attorney for Dr. Jefferson, to Ted A. Ross, Attorney for the TBVME (Nov. 6, 2015) (quoting *Bulverde*, 234 S.W.3d at 131) (emphasis omitted)).

[19] E-mail from Ted A. Ross to David P. Blanke TBVME (Nov. 16, 2015).

[20] E-mail from David P. Blanke to Ted A. Ross (Nov. 10, 2015).

[21] **Exhibit D** to the TBVME's Suggestion of Mootness.

[22] *Bulverde,* 234 S.W.3d at 131 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 189, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000)).

burden is imposed on defendants "because otherwise they would simply be free to 'return to [their] old ways' after the threat of a lawsuit had passed."[23]

Thus, for example, in *Del Valle Independent School District v. Lopez,* this Court held that a challenge to the constitutionality of a district's at-large electoral system was not moot despite the district's voluntary abandonment of the at-large system:

> Without a declaration by the court or an admission by Del Valle that the at-large system was unconstitutional, Del Valle was free to return to the at-large system. Therefore, because Del Valle refused to admit that the at-large system was unconstitutional, a declaration by the court that the system was unconstitutional was essential to Appellees' purpose: the elimination of the at-large system and the substitution of a single-member system.[24]

Rather than provide evidence "that the allegedly wrongful behavior could not reasonably be expected to recur,"[25] the TBVME points to its dismissal of the SOAH proceedings and its letters to Dr. Jefferson professing to close two investigations.[26]

---

[23] *Iron Arrow Honor Soc'y v. Heckler,* 464 U.S. 67, 72, 104 S. Ct. 373, 78 L. Ed. 2d 58 (1983) (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 633, 73 S. Ct. 894, 97 L. Ed. 1303 (1953)).

[24] 863 S.W.2d 507, 511 (Tex. App—Austin 1993, writ denied). *Bulverde*, 234 S.W.3d at 131 ("BexarMet contends it has voluntarily taken actions that moot Bulverde's and GBRA's justiciable interest. However, while BexarMet has withdrawn its petition to compel water from GBRA, the withdrawal was without prejudice to refiling, and BexarMet has not demonstrated that there is no reasonable expectation that it would refile. In addition, while BexarMet has cancelled its planned acquisition of four water systems in Comal County and withdrawn its application at the TCEQ seeking approval of the acquisition, BexarMet has not demonstrated that there is no reasonable expectation that it would resume its plans. We conclude that BexarMet has failed to demonstrate that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."); *compare Kountze Ind. Sch. Dist. v. Matthews*, No. 09-13-00251-CV, 2014 Tex. App. LEXIS 4951, *12-*16 (Tex. App.—Beaumont May 8, 2014, pet. filed) (discussing the combination of judicial admissions in litigation and a formally adopted policy that satisfied the mootness standard).

[25] *Bulverde,* 234 S.W.3d at 131 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 189, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000)).

[26] TBVME's Suggestion of Mootness at 2-3.

But, in dropping the SOAH charges, neither the TBVME and nor Oria made any "binding admission" that Dr. Jefferson's SAPA work falls within the owner exemption and is therefore outside Board's jurisdiction.[27]

As for "extrajudicial action that would prevent a recurrence of the challenged action,"[28] it is self-evident that, without any statutory or contractual restriction prohibiting it from reversing course, the TBVME's letters closing the investigations against Dr. Jefferson fall far short.

Additionally, the Board's pending investigation against another SAPA veterinarian provides it with a ready vehicle for such charges even without reversing tack. Finally, the Board's effort to resurrect two rules used to charge Dr. Jefferson provides the Board with potentially an additional vehicle for prosecuting her again. In short, Dr. Jefferson's appeal is not moot.

---

[27] *Bulverde*, 234 S.W.3d at 131.

[28] *Id.* (internal quotations omitted).

## PRAYER FOR RELIEF

For these reasons, Dr. Jefferson respectfully requests that (a) the Court deny the Board's request to dismiss her cross-appeal, and (b) grant her such other and further relief to which she has shown herself entitled.

Respectfully submitted,

EWELL, BROWN & BLANKE LLP



David F. Brown
State Bar No. 03108700
dbrown@ebblaw.com
David P. Blanke
State Bar No.  02453600
dblanke@ebblaw.com
111 Congress Avenue, 28th Floor
Austin, Texas 78701
512.770.4000
877.651.6384 (fax)

Ryan Clinton
State Bar No. 24027934
rdclinton@dgclaw.com
DAVIS, GERALD & CREMER, P.C.
111 Congress Ave., Suite 1660
Austin, Texas 78701
512.537.9938
432.687.1735 (fax)

*Attorneys for Appellee/Cross-Appellant*
*Ellen Jefferson, D.V.M.*

**CERTIFICATE OF SERVICE**

I certify that on November 23, 2015, I e-mailed this document to Ted. A. Ross, Assistant Attorney General, counsel of record for the TBVME and Oria (ted.ross@texasattorneygeneral.gov).

David P. Blanke

# EXHIBIT A

# Texas Board of Veterinary Medical Examiners

# Self-Evaluation Report



*September 2015*

# TABLE OF CONTENTS

I.      Agency Contact Information ................................................................... 1

II.     Key Functions and Performance .......................................................... 1

III.    History and Major Events.................................................................... 13

IV.     Policymaking Structure ...................................................................... 16

V.      Funding ............................................................................................. 21

VII.    Guide to Agency Programs ................................................................ 27

VIII.   Statutory Authority and Recent Legislation....................................... 42

IX.     Major Issues ..................................................................................... 46

X.      Other Contacts ................................................................................. 50

XI.     Additional Information ...................................................................... 53

XII.    Agency Comments ............................................................................ 57

Attachments  ............................................................................................. 58

# Texas State Board of Veterinary Medical Examiners



Self-Evaluation Report

# I.    Agency Contact Information

**Texas State Board of Veterinary Medical Examiners**
**Exhibit 1: Agency Contacts**

|  | Name | Address | Telephone & Fax Numbers | Email Address |
|---|---|---|---|---|
| **Agency Head** | Nicole Oria | 333 Guadalupe Ste. 3-810 Austin, TX 78701 | 512-305-755 512-305-7574 | nicole@veterinary.texas.gov |
| **Agency's Sunset Liaison** | Kate Fite | 333 Guadalupe Ste. 3-810 Austin, TX 78701 | 512-305-7555 512-305-7574 | kate@veterinary.texas.gov |

*Exhibit 1:  Agency Contacts*

# II.    Key Functions and Performance

## A.    Provide an overview of your agency's mission, objectives, and key functions.

**Mission**
The mission of the Texas Board of Veterinary Medical Examiners is to establish and enforce policies to ensure the best possible quality of veterinary and equine dental provider services for the people of Texas.

The Board's principal purpose is to ensure that the citizens of Texas have the services of veterinarians, equine dental providers, and licensed veterinary technicians who have demonstrated the ability to meet or exceed established minimum qualifications to enter practice in this state and to hold those licensees accountable to abide by the laws of the state and the rules of the Board. The Board currently regulates approximately 8,049 veterinarians; 48 equine dental providers; and 497 licensed veterinary technicians. These figures are as of August 31, 2014. An additional 966 technicians were licensed after September 1, 2014, with a total of 1,463 veterinary technicians licensed since the licensing program began in 2013. Although the Board provides direct services to these licensees, the Board's primary responsibility is to protect the public by assuring professional standards and accountability of those who provide veterinary and equine dental services to Texas citizens. The agency is organized by function, rather than by license type, to increase the efficiency of operations.

**Key functions:**

Licensing:

The Licensing and Examination Division (referred to as Licensure System in the General Appropriations Act "GAA") is charged with ensuring that only those persons who have demonstrated the ability to meet or exceed the minimum qualifications required to be a licensed veterinarian, veterinary technician, or equine dental provider in the state of Texas, enter the practice and provide

veterinary and equine dental services to Texas' citizens. As of September 1, 2011, the Board has statutory authority to license individuals who perform dentistry on equines, as Equine Dental Providers (EDP), and as of September 1, 2013, the Board has statutory authority to license veterinary technicians who may earn a license as a Licensed Veterinary Technician (LVT).

This division provides the following services: Application Processing, Consumer Services, and Licensing/Examinations.

Application Processing and Consumer Services has three functions: 1) assisting applicants in pre-licensure; 2) registration of licenses; and 3) providing information to consumers. Staff review applications for completeness and communicate with the individual about missing documentation and the status of their applications. In addition, they assure that individuals who are licensed as veterinarians, licensed veterinary technicians, and equine dental providers have the minimum professional character and basic educational preparation necessary to practice safely. The division is responsible for answering questions related to all aspects of licensing. In addition, the division is responsible for all maintenance requirements on licenses, and cancellation of licenses when the required fees are not paid or the forms are not filed.

Licensing/Examinations includes administering exams and licenses for veterinarians, veterinary technicians, and equine dental providers. The licensing specialists examine the application content and documentation to determine whether applicants meet requirements of the statute and rules. They may also need to request additional documentation from applicants. For example, licensing specialists often must review documentation from foreign countries to determine whether the applicants meet statutory requirements. The division also creates and administers exams necessary for the various types of licenses.  Licensing specialists also provide information regarding license verifications to other states at the request of the licensees.

Enforcement:

The enforcement program (referred to as Complaints and Action in the General Appropriations Act "GAA") is designed to protect consumers of veterinary services and ensure veterinarians, licensed veterinary technicians, and equine dental providers comply with the Veterinary Licensing Act and the Rules of Professional Conduct through the investigation of complaints and compliance inspections, as well as the investigation of the unlicensed practice of veterinary medicine.

Approximately one half of the Board's staff resources are devoted to the investigation and resolution of complaints from the public about the professional conduct of licensees. The Board has a range of disciplinary authority. Under certain circumstances, it can refuse to examine applicants, suspend, probate suspension, and revoke licenses; issue administrative and civil penalties; and hold informal conferences concerning alleged violations of the Veterinary Licensing Act and Board Rules. Timely, competently performed complaint investigations are perhaps the most direct consumer services the Board staff performs. The goal for the average number of days to resolve complaints is 180 days. We continue to believe that this is a worthy goal to achieve.

The Board has four functions that comprise the enforcement division: Investigations, Litigation, Enforcement Support, and Compliance.

Enforcement Support staff are located at the headquarters/Austin office and receive and process complaints and provide support for investigative work.

Investigative staff complete an initial review of complaints to determine if an investigation should be opened. Following an investigation, for medical cases, the investigative file is sent to two veterinary Board members for their review of a possible violation of standard of care. For non-standard of care cases, enforcement staff reviews the case.

Another critical dimension to the regulatory role is conducting compliance inspections. The Board's compliance inspection program is a valuable tool not only to ensure standards are met, but also to educate licensees and reduce violations and subsequent complaints. Fiscal Year 2013 ended with 605 on-site inspections and 286 by mail. Fiscal Year 2014 had 605 on-site inspections and 231 by mail.

General Counsel's Office
The General Counsel's office includes the General Counsel, one staff attorney, and one legal assistant. The General Counsel's office represents the Board in legal matters and provides legal counsel and support to the Board members and Board staff.

Specifically, the department works with the Enforcement Division to complete disciplinary matters. It provides legal counsel to the Enforcement and Licensure Divisions to assist with the review of cases and licensing applications. The department prosecutes cases against licensees, license applicants, and unlicensed persons, who have violated the Texas Veterinarian Licensing Act or related Board Rules. Attorneys may resolves cases informally after such cases are reviewed at either a Staff Conference and/or an Informal Conference ("IC") through proposed agreed orders or proposed cease and desist orders. The attorneys represent the Board during ICs and during Temporary Suspension proceedings. This department further initiates and prosecutes formal complaints on behalf of the Board through the formal adjudicative process at the State Office of Administrative Hearings ("SOAH"), including conducting legal research and preparing all legal pleadings.

The General Counsel's office provides support to the Office of the Attorney General in administrative appeals and all matters involving the support and defense of the law and Board Rules and policies. The General Counsel's office is responsible for Board rule and policy making including legal support for new rule initiatives, amendments, and repeals to Board rules. The department provides legal counsel for drafting bills and amendments for legislative consideration; works with and counsels the Board's Public Information Officer to properly respond to open record requests; provides counsel to the Board and Board staff regarding the legal interpretation of statutes, rules, and policies; and conducts legal research.

The General Counsel's office also regularly interacts with the public concerning questions on legal matters, including the Texas Veterinary Licensing Act, the Board's Rules, and other applicable statutes and rules governing state government functions, such as the Texas Public Information Act and Open Meetings Act.

This department also advises Board staff regarding personnel and contract matters.

Administration

The remainder of the Board's functions are performed by the remaining staff members of the Board in two divisions, Executive (including board administration, human resources, public information requests, including information regarding disciplinary actions, and website revisions) and Finance

(including Information Technology "IT"). These two divisions provide the direction and support needed to operate the agency on a daily basis.

In addition, the Board establishes standards for monitoring the continued competency of licensees practicing within their scope of practice, facilitating public input regarding the rulemaking process, and making information about the rules of professional conduct of licensees available in a timely manner.

**B.    Do your key functions continue to serve a clear and ongoing objective?  Explain why each of these functions is still needed.   What harm would come from no longer performing these functions?**

Each of the Board's key functions continue to be necessary. Enforcement of both the Act and the Rules reasonably ensures that the citizens of Texas and their pets and livestock receive care from properly educated and licensed veterinarians, veterinary technicians and equine dental providers. Without examination or basic knowledge and required continuing education throughout the licensee's career and licensure, the consumer is at risk of receiving substandard services for their animals and businesses and harm coming to their animals and livestock.

Renewal of a license with a continuing education requirement provides for a basic, realistic monitoring of the profession. This is complimented by regular compliance visits from staff. These compliance visits are conducted to ensure compliance with the Act and state and federal dangerous drug and controlled substances laws.  They also are conducted for educational purposes and provide an important link from this Board to the profession.

It is not anticipated that the mission of this Board will ever be considered accomplished, as the profession will have to continue to be regulated and monitored to provide a reasonable assurance of adequate services rendered to the citizens of Texas by a qualified professional whose basic, entry-level medical knowledge has been tested, and their understanding of all current laws and rules governing the profession on many levels is up-to-date.

With the shift to more interest by the public in the services provided to their family pets, the importance of regulation of the profession has increased.

**C.    What evidence can your agency provide to show your overall effectiveness and efficiency in meeting your objectives?**

The Board's key measures for performance are directly linked to licensing, complaint resolution, and compliance inspections.  Most of the elements are linked to the defined performance measures set out in the appropriations bill and are reported quarterly.  Agency management sees the key measures for licensing as accuracy and timeliness of license application processing, and deposits related to application and renewal fees. Key performance measures for enforcement are average resolution time for complaints and the number of compliance inspections conducted annually.  The Board continually meets the annual inspection performance measures and strives to continue to lower the average resolution time for complaints resolved. Both are directly related to staff levels.  There is always an uptick in average resolution time when there is staff turnover. Compliance inspections are dependent on adequate travel funds.

Each of the key measures are reported and reviewed at each Board meeting. Policy decisions are discussed and opinions are presented to the Board.

Other evidence of our Board's overall effectiveness and efficiency are customer service surveys that are sent out every other year to all licensees and complainants that provide the Board with an email address (approximately 73% of licensees). One of the past concerns of the customer service surveys was the outdated website for the Board and over the past year, Board staff has spent time with the Health Profession Council website designer and rolled out a new website this year. There are also plans for further enhancements to the website for next year. Below are two examples of feedback received from those who completed the most recent customer service survey.

> *I have had a veterinary license in six states (including Texas) and I think TBVME employees have been the friendliest and most helpful and courteous of any of the six states that I have worked with.*

> *All of my contact with the office concerned my application process for a Texas License. I have Licenses in Michigan and Colorado as well and there is no comparison between the Texas office in terms of ease of access, quality of help & information, efficiency and professionalism between those offices and yours. Excellent job.*

**D. Does your agency's enabling law continue to correctly reflect your mission, objectives, and approach to performing your functions? Have you recommended changes to the Legislature in the past to improve your agency's operations? If so, explain. Were the changes adopted?**

Generally the enabling law continues to reflect our mission, objectives and approach to performing our functions. However, the exemption language found in section 801.004 of the Act has created confusion and litigation as to its application to individuals that are actually licensed by the Act. For example, is a licensed veterinarian's practice of veterinary medicine unregulated when he or she works for a shelter or rescue group that owns the animals at issue? In all other professions, the professional's practice is regulated regardless of type of practice or employer. A human doctor does not have a different standard of care when operating on someone when working for a non-profit entity. Section 801.004 provides that an owner, employee of the owner, or designated caretaker of the animal is exempt from the Act. Clearly the phrase "designated caretaker" could, in theory, apply to anyone who is designated to provide care to an animal, such as a veterinarian or a person practicing veterinary medicine without a license. To this end, it is unclear as to whether the exemption language in the Act reflects the mission of the Board.

The Board has worked closely with the Texas Veterinary Medical Association ("TVMA") during each legislative session to update statutory language. In 2009, the Board recommended that TVMA support legislation to clean up the language in the Act, including language concerning confidentiality. That legislation did not pass. In 2011, a new group of licensees was created for Equine Dental Providers. Also in 2011, the Board recommended legislation that did pass regarding the peer assistance program and regarding confidential veterinary patient records. However, legislation to clean up the confidentiality of Board records statute did not pass. In 2013, another new group of licensees was created for Licensed Veterinary Technicians. In 2015, the Board worked with TVMA to develop

language to resolve the clarity issue concerning the owner exemption in 801.004(1); however, no legislation was passed.

**E.    Do any of your agency's functions overlap or duplicate those of another state or federal agency? Explain if, and why, each of your key functions is most appropriately placed within your agency.  How do you ensure against duplication with other related agencies?**

The board's functions in general do not overlap or duplicate those of another state or federal agency. However, the Board is often responsible for enforcing the laws and regulations of other entities on a day to day basis; while those other entities may address the larger cases.  Specifically, the Drug Enforcement Administration (DEA) and the Texas Department of Public Safety (DPS) have specific laws and regulations regarding dangerous drugs and controlled substances, including the handling of such drugs and the monitoring of their use.  Both DEA and DPS rely on the Board to inspect and oversee the veterinary population's compliance with those laws and regulations.

The Board also works many cases where an individual is practicing veterinary medicine or equine dentistry without a license.  This offense is also a criminal offense over which local law enforcement would have jurisdiction.  The Board often finds that local law enforcement does not have either the resources or the interest in pursuing these types of cases.

The Texas Department of State Health Services ("TDSHS") regulates shelters.  However, TDSHS's has verbally informed the Board that its actual jurisdiction is only over rabies issues and the quarantining of animals within shelters.  Therefore, depending on the interpretation of the exemption language in the Act, shelters may have no regulation of their treatment of animals outside of their treatment of rabies and communicable diseases.

In any areas where the Board's functions overlap those of another agency or entity, generally the other entity has criminal and administrative jurisdiction while the Board has only administrative jurisdiction. Therefore, an overlap in administrative penalties does not typically occur.

**F.    In general, how do other states carry out similar functions?**

Other states typically would also have similar overlaps regarding controlled substance issues.

All states license veterinarians and have a licensing agency similar to Texas, with some states licensing veterinary technicians and a few states licensing equine dental providers. All states have minimum competency requirements and standards for licensees. All states investigate complaints against licensees, but differences exist in the number of investigations undertaken as well as enforcement priorities. The scope of practice permitted for a license varies from state to state.

**G.    What key obstacles impair your agency's ability to achieve its objectives?**

The largest obstacle that impairs the Board's ability to achieve its objectives is the antiquated and unclear language in its enabling statute, the Veterinary Licensing Act. In addition, the lack of a fitness to practice requirement is an obstacle to the Board's ability to license individuals who are able to provide minimum adequate veterinary care to the people of the state of Texas. Other obstacles include the increase in the number of licensees who do not wish to be regulated at all and on the opposite end, people demanding increased regulation and penalties for licensees.

**H.  Discuss any changes that could impact your agency's key functions in the near future (e.g., changes in federal law or outstanding court cases).**

*Ellen Jefferson, D.V.M. v. Texas State Board of Veterinary Medical Examiners and Nicole Oria, in her official capacity as Executive Director*

Dr. Jefferson is the founder and chief executive officer of San Antonio Pets Alive! ("SAPA"), a "no-kill" animal shelter located in San Antonio, Texas.  In 2012, the Board received a complaint from a foster animal care provider about Dr. Jefferson's conduct related to a dog, which had been fostered out by SAPA.  Board staff followed its investigation procedures.  The Board then filed a notice of hearing at State Office of Administrative Hearings ("SOAH"), alleging violations of Chapter 801 of the Texas Occupations Code and administrative rules. In particular, the Board alleged that Dr. Jefferson failed to establish a veterinary client patient relationship prior to diagnosing and treating the dog and prior to prescribing and dispensing medication; failed to treat the dog with the required minimum standard of care; failed to maintain proper patient records; failed to properly label medication; and engaged in a pattern of acts that indicate consistent malpractice, negligence, or incompetence in the practice of veterinary medicine.  Dr. Jefferson asserts that she is exempt from the Veterinary Licensing Act and, thus, exempt from regulation in regard to her practice at SAPA.

The Board's position is that Dr. Jefferson, as a licensed veterinarian who is practicing veterinary medicine on animals, is regulated by the Board and subject to the standard of care requirements.  Her actions concerning the animals at issue were not based on her position as the executive director of SAPA but as the veterinarian of SAPA.  Further, Dr. Jefferson prescribed multiple dangerous drugs to an animal that she did not see or examine and about which she did not directly speak to the foster parent.  Dangerous drugs, which were previously handed out to volunteers, were simply left on a porch without a label for the foster parent to pick up at some time.  Dr. Jefferson's position that she should be able to diagnose, treat and prescribe drugs without ever examining the animal has created scenarios where the treatment provided was far below accepted standard of care in a shelter. Further, her handling of dangerous drugs, which are now labeled as controlled substances, was in violation of laws and regulations and created an atmosphere for easy diversion and abuse by humans.

Before the complaint could be heard by SOAH, Dr. Jefferson filed a district court case, asserting claims for declaratory relief under the Texas Uniform Declaratory Judgments Act ("UDJA"), as well as for injunctive relief, asking the court to find that the Board lacked jurisdiction to pursue a complaint against Dr. Jefferson.  She later filed an amended petition wherein she challenged several Board rules under the Texas Administrative Procedure Act.

The district court issued a final judgment which found that the court lacked jurisdiction as to Dr. Jefferson's UDJA claims and that Dr. Jefferson would have to follow the administrative process, including going to SOAH.  The court ruled that it had jurisdiction over Dr. Jefferson's rule challenge and went on to uphold the validity of the Board rules in question, with the exception of Board Rules 573.72 and 573.80(2).

Both parties have appealed the case to the Third Court of Appeals at Austin, Texas.

The SOAH case proceeded to a partial hearing before SOAH in December of 2014.  The administrative law judge ("ALJ") found that Dr. Jefferson was a designated caretaker for the

animals owned by SAPA and that Dr. Jefferson was the owner of the animals given her position with SAPA. Therefore, the Administrative Law Judge determined that Dr. Jefferson was exempt from the Veterinary Licensing Act for her treatment of the dog, in accordance with section 801.004 of the Act. The Board is awaiting a hearing on the remaining issues regarding Dr. Jefferson's handling of dangerous drugs and failure to cooperate with the Board.

If Dr. Jefferson is determined to be exempt from the Act by a court, then such ruling would impact the Board's treatment of veterinarians affiliated with shelters and rescue groups. As Dr. Jefferson was found by the ALJ to not be employed by the shelter, this outcome could impact all veterinarians that work with shelters in potentially any capacity. The impact could be that an entire group of licensees are unregulated. Further, the general public appears to believe that when a shelter or rescue group utilizes the services of a licensed veterinarian, then the animal is receiving a minimum standard of care. However, if these veterinarians are found to be exempt from the Veterinary Licensing Act, then they will not be required to uphold the standard of care and the public will be unaware.

Further, the district court invalidated the Board's rule providing a definition of the term "designated caretaker" which defined one to not include a person who cares for an animal after an animal has already developed a condition. If this definition continues to be invalidated, the Board may have great difficulty enforcing any of its laws or rules. "Designated caretaker" would only be given a reasonable or common definition – one who is designated to provide care. Therefore, any person practicing veterinary medicine without a license would likely claim (and has in the past) that he/she is simply a designated caretaker as the animal's owner provided the animal to that individual for the individual to provide it with care. The same argument would apply to any veterinarian or other licensee as all such individuals are generally designated to provide care to an animal by its owner. This would be an absurd result, rendering the Act moot; however, it is certainly a possibility.

*Ronald S. Hines, D.V.M. v. Bud E. Alldredge, Jr., D.V.M. in his official capacity as President of the Texas Board of Veterinary Medical Examiners, et al.*

> Dr. Hines is a Texas licensed veterinarian who created a website addressing pet health and care. Dr. Hines writes articles for his website. Dr. Hines also provided more targeted guidance and advice to specific pet owners about their specific pets. The advice included evaluating conflicting diagnoses or inappropriate drug prescriptions. Dr. Hines charged a fee but would waive the fee if owners could not afford the fee. Dr. Hines did not examine the relevant animals prior to advising treatment and care for those animals. Dr. Hines did not prescribe medication.
>
> Under Texas law, to practice veterinary medicine, a person must first establish a veterinary-client-patient relationship by examining the animal or making medically appropriate and timely visits to the premises on which the animal is kept. That examination must be in person. The Board notified Dr. Hines that he had violated Texas law by practicing veterinary medicine without a veterinary-client-patient relationship. Dr. Hines signed an agreed order, agreeing to certain penalties.
>
> Dr. Hines then filed suit in federal court, seeking declaratory and injunctive relief. Dr. Hines argued that the physical examination requirements violate his First Amendment right to free speech and his right to Due Process and Equal Protection under the Fourteenth Amendment.

The Board moved to dismiss the case. The district court dismissed the case as to Dr. Hines' due process and equal protection claims; however, the district court did not dismiss Dr. Hines' First Amendment claim. The district court found that the physical examination requirement "regulate[s] professional speech itself;" therefore, it was subject to the First Amendment.

The United States Court of Appeals for the Fifth Circuit found that Dr. Hines' services clearly constituted the practice of veterinary medicine. The Court further found that the physical examination requirement itself does not regulate speech and does not offend the First Amendment, even if the requirement has some impact on speech.

Dr. Hines has filed his Petition for Writ of Certiorari with the United States Supreme Court. If the Supreme Court found that requiring a physical examination violated a veterinarian's First Amendment rights, the practice of veterinary medicine would dramatically change.

*North Carolina State Board of Dental Examiners v. Federal Trade Commission*

The North Carolina State Board of Dental Examiners ("NCSBDE") is comprised of eight members. The NCSBDE is statutorily required to include six practicing dentists. The NCSBDE investigated non-dentists engaged in teeth whitening and issued cease and desist letters to such individuals warning them that teeth whitening was the practice of dentistry.

The Federal Trade Commission filed an administrative complaint charging the NCSBDE with violating antitrust laws. NCSBDE asserted state-action immunity. The United States Supreme Court held that state-action immunity does not extend to a state board controlled by active market participants unless the state is actively supervising the relevant Board. The Supreme Court states the "active market participants cannot be allowed to regulate their own markets free from antitrust accountability."

Like the NCSBDE and other Texas regulatory agencies, the Board is also comprised by a majority of "active market participants." This case may lead to a restructuring of Texas state regulatory agencies.

*Teladoc, Inc. v. Texas Medical Board*

Teladoc offers physician consultations over the phone after reviewing medical records. The Teladoc physician may prescribe medications. The Texas Medical Board ("TMB") adopted a rule that clarified that prescribing medications without an in-person examination was prohibited. The United States District Court judge granted Teladoc's temporary restraining order and preliminary injunction to stop the application of the TMB rule. The court found that "the balance of respective interests of the parties and the public weigh in favor" of granting Teladoc's petition. The court further stated that TMB's attempt to stop Teladoc physicians would, in essence, eliminate a group of physicians and that the "[e]limination of physicians providing health care would thus negatively impact not just the competitor physicians, but consumers, a classic anti-trust injury." TMB maintained that in-person examinations are necessary to provide patients with a minimum level of the standard of care.

At this time, the main lawsuit is proceeding. Its outcome could impact the Board as the Board currently requires in-person examinations of animals prior to diagnosis and treatment.

## I.     What are your agency's biggest opportunities for improvement in the future?

Licensing

We are currently in development of a new license examination process that would allow our applicants to take the state board exams on an "on-demand" schedule instead of the current scheduling window process. Our third-party vendor, eStrategy Solutions, administers the licensing exams for veterinarians, technicians, and equine dental providers, and is working out the details of how we can offer these exams virtually every business day, rather than only during an exam window. This new process will enable the Licensing and Examination Division to have a consistent work flow of processing new applications daily, rather than enduring an extremely heavy workload of processing applications centered on a scheduling deadline. The applicants will benefit from this change, because they will no longer have to plan their new job or internship around having to wait until the next available state board exam. We have found that some of the required documentation takes longer to obtain than the applicants realize, and then they miss the exam window because their application was not complete by the application deadline. Missing one exam deadline and having to take the next available exam means having to wait almost 2 months longer for their license. This is a hardship for new graduates needing to obtain their first job, as well as an applicant who is relocating from another state and needs to start work before the next exam window.

This new license exam process is scheduled to be implemented on January 1, 2016.

Enforcement

With an additional investigator authorized and appropriated to the Board, the Board expects compliance inspections to increase by 150 which will reduce the amount of time on average between inspections. This individual should also help reduce the average resolution time on complaints. This performance measure will also be improved with the Board going to 4 Board meetings per year.

Overall

The Board also received the authorization and appropriations for an information technology person who will work with the Board's department heads and the agency database to further increase functionality of the database and efficiencies received from the database.

In order to succeed in today's world, the Board must have an Internet presence. A website is a powerful first impression and it gives the public, the licensees and the Board an invaluable platform for data exchange. The website is available to the public and licensees 24 hours a day, 7 days a week, 365 days a year.

The Board's website helps leverage web services for streamlining data transfer and reducing man hours in the office allowing the Board to maintain a minimal staff but still exceed expectations for performance measures.

The new web design makes it easier for the public and licensees to obtain information about the Board and to download forms. Implementing the new design was the initial step in the process of creating a user-friendly website. There are still upgrades that are planned to enhance the public and the licensees' experience with the Board.

The Board receives faxes from the veterinarian population to register low costs clinics all over the state. Moving this function to the website by allowing the licensee to enter the information directly on the website will reduce paper, toner and man hours retyping the fax information into a retrievable, usable form of data.

There are several forms on the website that are only available to download and print. It is planned to have these forms fillable on the website and have the form directly submitted to the Board via the website. This will save the public and licensee money by not needing to mail in the form and save the Board money and man hours by having the information in electronic form therefore making the services of the Board quicker to render.

Daily address changes drain the Board's resources. By moving this function to the website the data entry is diverted from the staff to the licensee, allowing the Board staff to focus more on application processing and renewals and reducing paper consumption. Allowing the licensee to make the address change ensures the accuracy of the data and makes the change effective immediately by transferring the data to the database.

The creation of a secure portal for communication between the Board and the licensee will allow the Board to collect, maintain and process applications in an efficient manner and with transparency to the licensee, as well as allow address changes, collection of volunteer work hours, recording of continuing education and reducing phone calls to the Board because the licensee will have all the information they need available to them on their time schedule.

The streamlining of the above processes will bring a great benefit to the public that the Board serves and protects and to the licensees that the Board licenses and regulates. Clear and transparent communication is the goal of the Board and with the changes that are planned, this goal will be a reality for the Board.

Finally, any additional clarity to the Veterinary Licensing Act will also be a large opportunity for improvement as less staff time will be required interpreting the Act and less litigation will be required to interpret the Act.

**J.  In the following chart, provide information regarding your agency's key performance measures included in your appropriations bill pattern, including outcome, input, efficiency, and explanatory measures.**

**Texas State Board of Veterinary Medical Examiners— Fiscal Year 2014**
**Exhibit 2:  Key Performance Measures — Fiscal Year 2014**

| *Key Performance Measure* | *FY 2014 Target* | *FY 2014 Actual Performance* | *FY 2014 % of Annual Target* |
|---|---|---|---|
| **A. Goal: Veterinary Regulation Outcome Measures** | | | |
| Percentage of Licensees with No Recent Violations | 99% | 96.33% | 97.30% |
| Percent of Licensees Who Renew Online | 91% | 90.59% | 99.55% |
| Percentage of Complaints Resulting in Disciplinary Action | 33.4% | 31.74% | 95.03% |
| Recidivism Rate for Peer Assistance Programs | 6% | 0% | 0% |
| **A.1.1. Strategy: Operate Licensure System Output Measures** | | | |
| Number of New Licenses Issued to Individuals | 476 | 926 | 194.54% |
| Number of Licenses Renewed (Individuals) | 7,898 | 7,778 | 98.48% |
| **A.2.1. Strategy: Complaints and Action Output Measure** | | | |
| Number of Complaints Resolved | 402 | 438 | 108.96% |
| **A.2.1. Strategy: Complaints and Action Efficiencies Measure** | | | |
| Average Time for Complaint Resolution (Days) | 225 | 204 | 90.67% |
| **A.2.1. Strategy: Complaints and Action Explanatory Measure** | | | |
| Number of Jurisdictional Complaints Received | 395 | 525 | 132.91% |
| **A.2.2. Strategy: Peer Assistance Output Measure** | | | |
| Number of Licensed Individuals Participating in a Peer Assistance Program | 17 | 22 | 129.41% |

*Exhibit 2:  Key Performance Measures*

## III. History and Major Events

- 1911 The 32nd Legislature passed House Bill 62, creating the Veterinary Licensing Act (the "Act") and the Texas State Board of Veterinary Medical Examiners. The newly created Board was charged with regulating the practice of veterinary medicine, surgery and dentistry according to the new Veterinary Licensing Act.

- 1920 The 36th Legislature repealed the 1911 law and passed Senate Bill 83 as the new Veterinary Licensing Act. The new law continued the Board, required licensees to have their certificate of license recorded in the office of the District Clerk of the county where they resided and to display the license. The law provided the Board with the ability to refuse to admit for examination persons who obtained a license, certificate or diploma illegally or fraudulently.

- 1953 The 53rd Legislature amended the Act, giving the Board the authority to hire an Executive Secretary and other staff as it deemed advisable to carry out the purposes of the Act. The amendment also gave the Board the ability to adopt rules of professional conduct and outlined the qualifications of a person seeking licensure. The Board was also given the ability to impose civil penalties and other sanctions to enforce the rules set by the Board.

- 1957 The 55th Legislature amended the Act, fixing a venue for appeals from orders of the Board. The Act established the Veterinary Fund where all fees collected by the Board were deposited. The Veterinary Fund was to be utilized to pay compensation and expenses of Board members, salaries and expenses of employees and all other costs of the Board in the administration of the Act. No funds were to be paid out of the General Fund of the State for the administration of the Act.

- 1959 The 56th Legislature amended the Act, removing limitations to the Board's ability to adopt, alter or amend rules of professional conduct and gave the Board the ability to adopt rules that were "appropriate to establish and maintain a high standard of integrity, skills and practice in the profession" as well as adding the violation of the rules of professional conduct and allowing another individual to use their license or certificate to practice veterinary medicine to the list of grounds for the suspension or revocation of a license as well as grounds to refuse to examine an applicant, issue or renew a license. The Act was also amended to allow licensees who were full time members of colleges and provided services for the sole benefit of the school or college and who did not engage in private practice to pay only half of the annual renewal fee.

- 1965   The 59th Legislature added county attorneys to the list of those who may institute an injunction against the unlawful practice of veterinary medicine.

- 1967   The 60th Legislature removed the term "moral turpitude" from the list of reasons that a license may be revoked or suspended or when the Board could refuse to examine an applicant or issue/renew a license and listed the offense as "convicted of a felony". The Act was also amended to prohibit the Board from spending beyond what was appropriated and raised the amount after which funds would revert from the Veterinary Fund to the General Fund from $20,000 to $40,000.

- 1981   The 67th Legislature completed a major revision of the Act, adding language that required the Board to follow the State's Open Meetings law and Administrative Procedures and Texas Register Act. The changes added 3 members to the Board (2 public and 1 veterinarian), revised the rules regarding Board member qualifications to allow for public members, and removed the set per diem and travel reimbursement for members. Also included in this revision were such items as instructions concerning ethics for members and staff, grounds for removal from the Board, development of a career ladder and annual performance system as well as the removal of the requirement for the Attorney General's office to approve all rules and language that set in place avenues for legislative input into rule making. Veterinarians were required to maintain a record keeping system for controlled substances and the Board was prohibited from restricting advertising. New requirements for the Board's interaction with its licensees and the public were put in place, including a requirement that the Board advise examinees of their scores within specific timeframes, provide failing examinees with an analysis of their performance on the exam and a requirement for the Board to prepare and make available consumer information on the regulatory functions of the Board, including the complaint process. For the first time, the Board was permitted to set the fees they would collect although limits were set on the amounts of those fees and the State Auditor's Office would be required to perform financial audits of the Veterinary Fund at least once each fiscal biennium. The Board would submit written reports to the Governor and Legislature detailing funds received and dispersed. Other items added to the Act allowed the Board to establish a voluntary continuing education program, required that the Board suspend the license of those convicted of a controlled substance felony and placed restrictions on the reinstatement of those licenses. Failure to report a disease to the Texas Animal Health Commission was added to the list of offenses that could cause the revocation or suspension of a license.

- 1987 The 70th Legislature added provisions for a Special License. The ability to take disciplinary actions, including civil penalties, was added as well as language classifying fraud as a class B misdemeanor for Board members and staff. The amount after which funds would revert from the Veterinary Fund to the General Fund was raised to $150,000. A $110 temporary fee was added to exam and renewal fees and the Board member composition was changed to reflect 6 veterinarians and 3 public members.

- 2011 The 82nd Legislature established application requirements and qualifications for an equine dental provider (EDP) license, which is issued by the Board, established the responsibility and scope of practice of the license holder, established continuing education requirements for renewal of the license, and made related changes. House Bill 414 amended the Occupations Code to prohibit a person from performing equine dentistry unless the person is a veterinarian or a licensed equine dental provider under the supervision of a veterinarian. The bill required the Board to develop and administer a specific EDP jurisprudence examination and to adopt rules and procedures to implement the bill's provisions.

- 2013 The 83rd Legislature established the authorization for the Board to administer a licensing and regulatory program for veterinary technicians. This law became effective September 1, 2014. This law allowed for a grandfathering period which started on September 1, 2013 and ended on September 1, 2014. After September 1, 2014 an individual may not use the term 'LVT' or refer to themselves as a 'Licensed Veterinary Technician' without a license from this Board. The law required the Board to develop and administer a specific jurisprudence examination and to adopt rules and procedures to implement the bill's provisions.

Since 1911, the Board has issued 13,551 licenses to veterinarians, 497 licenses to veterinary technicians, and 52 licenses to equine dental providers (as of August 31, 2014).

## IV. Policymaking Structure

### A. Complete the following chart providing information on your policymaking body members.

**Texas State Board of Veterinary Medical Examiners**
**Exhibit 3: Policymaking Body**

| Member Name | Term / Appointment Dates / Appointed by *(e.g., Governor, Lt. Governor, Speaker)* | Qualification *(e.g., public member, industry representative)* | City |
|---|---|---|---|
| Bud E. Alldredge, Jr., DVM | 2nd Term/ 10-07-05 to 8-26-15 /Governor | Industry Representative | Sweetwater |
| Janie Allen Carpenter, DVM | 2nd Term/3-13-06 to 8-26-17 /Governor | Industry Representative | Garland |
| Dan Lee Craven, DVM | 1st Term/10-10-13 to 8-26-19 /Governor | Industry Representative | Crockett |
| J. Todd Henry, DVM | 1st Term/08-09-10 to 8-26-15 /Governor | Industry Representative | Wimberley |
| Joe Mac King, DVM | 1st Term/09-06-11 to 8-26-17 /Governor | Industry Representative | Dallas |
| Roland Lenarduzzi, DVM | 1st Term/10-10-13 to 8-26-19 /Governor | Industry Representative | Alvin |
| James McAdams | 1st Term/10-10-13 to 8-26-19 /Governor | Public Member | Seguin |
| Keith Pardue | 1st Term/09-16-14 to 8-26-15 /Governor | Public Member | Austin |
| Chad Upham | 1st Term/09-06-11 to 8-26-17 /Governor | Public Member | Boerne |

*Exhibit 3: Policymaking Body*

### B. Describe the primary role and responsibilities of your policymaking body.

The primary role and responsibilities of the policy-making body include the following:

- Employs the Executive Director and ensures that the Executive Director carries out the management and administration of Board functions;
- Sets policy for the Board;
- Passes rules to implement the Veterinary Licensing Act, establishes standards of veterinary and equine dental practice and regulates the practice of veterinary medicine and equine dental practice.
- Exercises decision making authority on disciplinary actions;
- Reviews key documents such as performance reports, customer service surveys and various audits of Board operations;
- Approves various Board reports including Annual Financial Report and Legislative Appropriations Request;
- Sets licensing fees annually;

- Monitors representation by the Office of Attorney General in Board litigation;
- Decides matters of eligibility for licensure and discipline of licensees, including temporary suspension of a license, and administrative penalties;
- Board members serve on a rotating basis on the Enforcement Committee and may decide matters of eligibility for licensure and discipline, including temporary suspension of a license with notice to the licensee;
- Selected members of the Board serve on the Executive Disciplinary Committee to decide initial hearings of temporary suspension hearings without notice to the licensee;
- Selected members of the Board serve on the Rules Committee to propose rules for the Board and review public comments and make changes to proposed rules based upon comments;
- Selected members of the Board serve on the Equine Dental Provider Committee to advise on rules and disciplinary actions for equine dental providers;
- Selected members of the Board may serve on and participate in other designated ad hoc committees as deemed necessary.

## C. How is the chair selected?

The Board President is appointed by the Governor from among Board members, as per §801.055(b) of the Veterinary Licensing Act.

## D. List any special circumstances or unique features about your policymaking body or its responsibilities.

The Board consists of 9 members appointed by the Governor with the advice and consent of the Senate. Six veterinary members are appointed and three public members.

Enforcement Committee members are appointed by the President of the Board. There are always 2 licensed veterinarians on the board serving a staggered 2 year term and all public members serve on the committee (1 public member per meeting) on a rotating basis.

Executive Disciplinary Committee members are appointed by the President and consist of the President, the Board Secretary, and one public board member.

Equine Dental Provider Advisory Committee members are appointed by the President. The committee consists of 2 equine dental provider licensees who have resided in and engaged in the practice of smoothing or filing teeth by floating in this state for the 5 years immediately preceding the date of appointment and are of good repute and a veterinarian licensee that has an active license, in good standing and who supervises a licensed equine dental provider.

Rules Committee members are appointed annually by the President of the Board.

## E. In general, how often does your policymaking body meet? How many times did it meet in FY 2014? In FY 2015?

Our board in the past has generally met three times a year. In FY 2014 and in FY 2015, the Board met three times a year. However, beginning in FY 2016, the Board will meet four times a year. The Enforcement Committee usually meets 10-11 times a year in conjunction with public board meetings if held that month (not including any temporary suspension hearings required).

**F.    What type of training do members of your agency's policymaking body receive?**

All Board members receive a notebook of information including:
- Veterinary Licensing Act
- Board Rules
- Most recent audit information
- Strategic Plan
- Legislative Appropriation Request
- Annual Financial Report
- Board Organizational Chart
- Link to the Open Meetings Act training provided by the Office of the Attorney General

In addition, they receive in-person orientation and training by the Executive Director upon appointment and may sit in on the training again at any later point. The orientation provides the attendees an overall explanation of the Board's jurisdiction, powers, functions and duties of the Board member. In addition, there is training presented about the Texas laws that govern board activities, including Board statutes and rules, the Open Meetings Act, the Public Information Act, the Administrative Procedure Act, and legal provisions regarding ethical conduct. They are also informed of the responsibilities of the Board and the process of the Board in licensing and resolving complaints. New members are also given the mandatory ethics during the orientation. They also receive specific required training on state contracting laws and rules.

New board members are encouraged to attend an orientation program conducted by the Governor's Office. Also, during regularly scheduled full board meetings, the members are provided training on various topics related to the Board's activities. In the past, these Board development sessions have included such topics as financial reporting for state agencies and legislative appropriations process and budgeting by Board staff. The Agency's bill pattern has been taught line by line and discussed in detail with the goal of the Board having a clear understanding of the funding for the Agency's strategies. There was also training where the General Appropriations Act was reviewed to explain the budgeting process with the Legislature and revenue requirements.

**G.    Does your agency have policies that describe the respective roles of the policymaking body and agency staff in running the agency?  If so, describe these policies.**

The Veterinary Licensing Act sets forth the roles of the policymaking body and the Board staff and the Board formally adopted a policy regarding the role of the policymaking body and staff in running the agency. Section 801.104 of the Veterinary Licensing Act requires the board to develop and implement policies that clearly separate policymaking responsibilities of the board and the management responsibilities of the executive director and board staff.  The Board is responsible for adopting rules, approving required reports (e.g. Strategic Plan, Legislative Appropriation Request, Annual Financial Report), approving disciplinary actions against licensees and non-licensees believed to be practicing without a license, and sets fees.  Board staff is responsible for processing applications for licensure, renewing licenses, collecting fees, preparing required reports for approval by the Board, investigating complaints, and responding to all inquiries from the public and other entities. A copy of this policy is attached hereto as an addendum.

For licensing and enforcement matters, formally adopted rules and regulations delineate responsibility of the staff and the Board. Previously, the Board has voted to delegate review and approval responsibility of licensing applications to staff to be handled administratively. For instance, veterinary applicants who petition the Board for a waiver of the Clinical Competency Test (CCT) requirement for licensure have had to appear before the Board for approval. However, at the February 21, 2002 board meeting, the Board voted to allow staff to approve CCT waiver petitions administratively for those applicants who have been in actual private practice immediately preceding their petition. The applicants who have not been in actual private practice immediately preceding their petition for a waiver of the CCT requirement will need to appear before the Board as stated in Rule 571.5(c).

The description of respective roles of the policymaking body and Board staff are located in Board rule, §577.16. The rule states that the role of the policymaking body is to establish policies and promulgate rules to establish and maintain a high standard of integrity, skills, and practice in the profession of veterinary medicine in accordance with the Veterinary Licensing Act. It is the responsibility of the Executive Director and board staff to administer the policies, rules, and directives as set by the board.

**H. What information is regularly presented to your policymaking body to keep them informed of your agency's performance?**

The Board, at every Board meeting, receives a written report on performance measures for the previous quarter (as well as an annual overview at year-end), a written report from licensing stating licensing exam results and licensing statistics, a written report from enforcement showing trends for the last four years regarding numbers of complaints, resolution times, numbers of cases conferenced, numbers of inspections, a report of all complaints filed during the current fiscal year, and percentages of cases resulting in disciplinary action, as well as a verbal update from Licensing, Enforcement and Legal Department Heads, and the Executive Director, concerning any relevant or ongoing activities of the Board on matters of interest to the Board. In addition, the Chief Financial Officer provides a detailed overview of expenditures and review for the previous quarter and at the end of a fiscal year, an annual overview. These formal reports are provided in addition to frequent informal conversations and communications between the Executive Director and board members.

In addition, the Board is presented with periodic audit reports conducted concerning the agency and its activities as required by law. The results of any external audit are presented to the Board at the board meeting following the audit report.

**I. How does your policymaking body obtain input from the public regarding issues under the jurisdiction of the agency? How is this input incorporated into the operations of your agency?**

Board members receive comments regarding issues under the Board's jurisdiction in connection with the public meetings. The public is invited to each board meeting to make public comments or provide written comments on any issue. Written public comment on Board rules received by Board staff are also forwarded to the members of the Rules Committee for their consideration during their meetings as well as to the full Board for their consideration in the public meeting. The agency and the Board abide by the requirements of the Government Code as well as the Administrative Procedure Act relating to open meetings and public comments regarding rulemaking. Board staff maintains a list of interested parties who have asked to receive notice of all board meetings along with a meeting agenda, and provides that information for those parties. In addition, Board staff maintains a list of interested

parties who have asked to receive notice of proposed rules that are published in the *Texas Register*, and provides those parties with the requested information.

All materials prepared and distributed for board members in advance of a meeting are published on the Board's website in advance of the meeting. Any member of the public who wishes to know about any matter on the board's agenda has access to the same material the board will reference at its meeting. In addition to posting proposed rules in the *Texas Register* for public comment, those rules appear on the Board's web site, together with a summary of the rule. Thus the public has additional access to matters disclosed pursuant to the Administrative Procedure Act, the Public Information Act and the Open Meetings Act in a convenient and easily understood format.

The Board also engages in stakeholder meetings with interested parties on controversial or difficult issues. The Board staff also conducts informal meetings with stakeholders in person, by phone and/or email regarding issues under the jurisdiction of the Board. The Board works with the Texas Veterinary Medical Association, which represents veterinarians across Texas and the Texas Association of Registered Veterinary Technicians, which represents now licensed veterinary technicians across Texas on issues and rules before the Board. The Board also conducts public hearings on proposed rules when requested, as set out in the Administrative Procedures Act.

**J.** **If your policymaking body uses subcommittees or advisory committees to carry out its duties, fill in the following chart.**

**Texas State Board of Veterinary Medical Examiners**
**Exhibit 4: Subcommittees and Advisory Committees**

| Name of Subcommittee or Advisory Committee | Size / Composition / How are members appointed? | Purpose / Duties | Legal Basis for Committee |
|---|---|---|---|
| Enforcement Committee | 3/2 veterinary board members, 1 public board member/appointed by the Board President | Attend and offer disciplinary recommendations at informal conferences and temporary suspension hearings | Section 801.408(c) of the Veterinary Licensing Act |
| Executive Disciplinary Committee | 3/President and 2 other Board members/appointed by the Board President | Attend and vote on temporary license suspension hearings-(no notice) | Section 801.409(a) of the Veterinary Licensing Act |
| Equine Dental Provider Advisory Committee | 3/2 EDPs and 1 veterinary licensee who supervises an EDP/ appointed by the Board President | Advise and assist Board in adopting rules relating to licensed equine dental providers. Board consults committee on disciplinary matters regarding licensed equine dental providers. | Section 801.551 of the Veterinary Licensing Act |
| Rules Committee | 4/varies/ appointed by the Board President | Evaluates issues, receives and considers public input and develops proposed rules for the full Board. | Section 801.163 of Veterinary Licensing Act |
| Ad Hoc Committees | 4 or less/varies/ appointed by the Board President | The Board may appoint temporary committees to assist in resolving particular veterinary or equine dental provider issues. | Section 801.163 of Veterinary Licensing Act |

*Exhibit 4: Subcommittees and Advisory Committees*

# V. Funding

## A. Provide a brief description of your agency's funding.

Method of finance is General Revenue and Appropriated Receipts.

## B. List all riders that significantly impact your agency's budget.

HB 1, 84th Leg. R.S.

I.   Article VIII Section 8.C State Office of Administrative Hearing
II.  Article IV Section 8.2 Contingency for Behavioral Health Funds
III. Article VIII Section 3 Funding for Health Professions Council.
IV.  Article VIII Section  4 Texas.gov Appropriation
V.   Article VIII Section 5 Peer Assistance Program Funding Requirements
VI.  Article IX Section 18.55 Prescription Drug Monitoring Program, Fees shall be collected by agencies that license individuals or entities authorized to access the prescription drug order monitoring program, and transferred to the Board of Pharmacy.

## C. Expenditures by Strategy

**Texas State Board of Veterinary Medical Examiners**
**Exhibit 5:  Expenditures by Strategy — 2014 (Actual)**

| Goal / Strategy | Amount Spent | Percent of Total | Contract Expenditures Included in Total Amount |
|---|---|---|---|
| Operate Licensure System | $169,654.24 | 15% | $236.37 |
| Complaints and Action | $720,949.42 | 62% | $8,525.75 |
| 83rd Art. IX, Sec. 18.48 | $109,505.00 | 9% | $43,082.50 |
| Peer Assistance | $30,000.00 | 3% | $30,000.00 |
| Texas.gov | $38,130.00 | 3% | $38,130.00 |
| Licensing – Indirect Admin | $23,871.00 | 2% | $1,849.11 |
| Complaints and Action Indirect Admin | $73,241.00 | 6% | $3,642.69 |
| **GRAND TOTAL:** | **$1,165,350.66** | **100%** | $125,466.42 |

*Exhibit 5:  Expenditures by Strategy*

**D.** **Show your agency's sources of revenue.** **Include all local, state, and federal appropriations, all professional and operating fees, and all other sources of revenue collected by the agency, including taxes and fines.**

**Texas State Board of Veterinary Medical Examiners**
**Exhibit 6: Sources of Revenue — Fiscal Year 2014 (Actual)**

| Source | Amount |
|---|---|
| General Revenue Fund | $1,051,767 |
| Appropriated Receipts | $4,832 |
| Other Direct and Indirect Costs Appropriated | $290,311 |
| Professional Fees COBJ 3171 | $1,387,620 |
| Licensing Fees COBJ 3175 | $1,671,377 |
| Administrative Penalties | $94,050 |
| **TOTAL** | **$4,499,957** |

*Exhibit 6: Sources of Revenue*

**E.** **If you receive funds from multiple federal programs, show the types of federal funding sources.**

This is not applicable, as this Board does not receive federal funds.

**F.** **If applicable, provide detailed information on fees collected by your agency.**

**Texas State Board of Veterinary Medical Examiners**
**Exhibit 7: Fee Revenue — Fiscal Year 2014**

| Fee Description/ Program/ Statutory Citation | Current Fee/ Statutory Maximum | Number of Persons or Entities Paying Fee | Fee Revenue | Where Fee Revenue is Deposited *(e.g., General Revenue Fund)* |
|---|---|---|---|---|
| Veterinarian <90 days late renewal Professional Fee HB 11 & HB 3442 | $200 per annual late renewal | 410 | $82,000 | General Revenue |
| Veterinarian <90 days late fee Gov't Code 801.154 | $161 per annual late renewal | 410 | $66,010 | General Revenue |
| Veterinarian <90 days late Texas.gov fee Gov't Code 801.154 | $5 per online renewal | 410 | $2,050 | Texas.gov |
| Veterinarian <90 days late renewal fee Gov't Code 801.154 | $80 per renewal | 412 | $32,960 | General Revenue |
| Veterinarian <90 days late Peer Assistance Fee Gov't Code 801.154 | $4 per annual renewal | 410 | $1,640 | Peer Assistance Program |
| Veterinarian >90 days late fee Gov't Code 801.154 | $161 per annual late renewal | 8 | $1,284 | General Revenue |
| Veterinarian >90 days late renewal fee Gov't Code 801.154 | $161 per annual late renewal | 7 | $1,203 | General Revenue |
| Veterinarian >90 days late renewal Professional Fee HB 11 & HB 3442 | $200 per annual renewal | 9 | $1,820 | General Revenue |

| Fee Description/ Program/ Statutory Citation | Current Fee/ Statutory Maximum | Number of Persons or Entities Paying Fee | Fee Revenue | Where Fee Revenue is Deposited *(e.g., General Revenue Fund)* |
|---|---|---|---|---|
| Veterinarian >90 days late Texas.gov fee Gov't Code 801.154 | $5 per online renewal | 9 | $45 | Texas.gov |
| Veterinarian >90 days late Peer Assistance Fee Gov't Code 801.154 | $4 per annual renewal | 8 | $32 | Peer Assistance Program |
| Veterinarian current renewal Professional Fee HB 11 & HB 3442 | $200 per annual renewal | 6,402 | $1,280,400 | General Revenue |
| Veterinarian current renewal fee Gov't Code 801.154 | $161 per annual renewal | 6,398 | $1,030,117 | General Revenue |
| Veterinarian current renewal Texas.gov fee Gov't Code 801.154 | $5 per online renewal | 6,429 | $32,145 | Texas.gov |
| Veterinarian current renewal Peer Assistance fee Gov't Code 801.154 | $4 per annual renewal | 6,402 | $25,608 | Peer Assistance Program |
| Veterinarian License Re-activation Professional Fee HB 11 & HB 3442 | $200 per re-activation | 16 | $3,200 | General Revenue |
| Veterinarian License Re-activation Fee Gov't Code 801.154 | $25 per re-activation | 17 | $425 | General Revenue |
| Veterinarian License Reinstatement Professional Fee HB 11 & HB 3442 | $200 per reinstatement | 3 | $600 | General Revenue |
| Veterinarian License Reinstatement Fee Gov't Code 801.154 | $166 per reinstatement | 3 | $498 | General Revenue |
| Veterinarian License Reinstatement Peer Assistance Fee Gov't Code 801.154 | $4 per reinstatement | 3 | $12 | Peer Assistance Program |
| Veterinarian Special license <90 days late renewal Professional Fee HB 11 & HB 3442 | $200 per annual renewal | 1 | $200 | General Revenue |
| Veterinarian Special license <90 days late Renewal Fee Gov't Code 801.154 | $161 per annual renewal | 1 | $161 | General Revenue |
| Veterinarian Special license <90 days late Fee Gov't Code 801.154 | $80 per annual renewal | 1 | $80 | General Revenue |
| Veterinarian Special license <90 days Peer Assistance Fee Gov't Code 801.154 | $4 per annual renewal | 1 | $4 | Peer Assistance Program |
| Veterinarian Special license current renewal Professional Fee HB 11 & HB 3442 | $200 per annual renewal | 92 | $18,400 | General Revenue |
| Veterinarian Special license current renewal fee Gov't Code 801.154 | $161 per annual renewal | 92 | $14,812 | General Revenue |
| Veterinarian Special license current Peer Assistance fee Gov't Code 801.154 | $4 per annual renewal | 94 | $376 | Peer Assistance Program |
| Criminal History Review Gov't Code 801.154 | $32 per review | 5 | $160 | General Revenue |
| Equine Dental Provider <90 days late renewal fee Gov't Code 801.154 | $200 per annual renewal | 5 | $,1000 | General Revenue |
| Equine Dental Provider < 90 days late fee Gov't Code 801.154 | $100 per annual renewal | 5 | $500 | General Revenue |
| Equine Dental Provider Renewal Fee Gov't Code 801.154 | $200 per annual renewal | 52 | $10,300 | General Revenue |

| Fee Description/ Program/ Statutory Citation | Current Fee/ Statutory Maximum | Number of Persons or Entities Paying Fee | Fee Revenue | Where Fee Revenue is Deposited *(e.g., General Revenue Fund)* |
|---|---|---|---|---|
| Licensed Veterinary Technician Application Fee Gov't Code 801.154 | $70 per application | 1,404 | $98,290 | General Revenue |
| Veterinarian License Application Fee Gov't Code 801.154 | $555 per application | 443 | $245,860 | General Revenue |
| Veterinarian Inactive License <90 days late renewal fee Gov't Code 801.154 | $161 per annual renewal | 61 | $9,821 | General Revenue |
| Veterinarian Inactive License <90 days late fee Gov't Code 801.154 | $80 per annual renewal | 61 | $4,880 | General Revenue |
| Veterinarian Inactive License <90 days Texas.gov fee Gov't Code 801.154 | $5 per online renewal | 61 | $305 | Texas.gov |
| Veterinarian Inactive License <90 days late Peer Assistance Fee Gov't Code 801.154 | $4 per annual renewal | 61 | $244 | Peer Assistance Program |
| Veterinarian Inactive License >90 days late renewal fee Gov't Code 801.154 | $161 per annual renewal | 8 | $1,286 | General Revenue |
| Veterinarian Inactive License >90 days late fee Gov't Code 801.154 | $161 per annual renewal | 8 | $1,286 | General Revenue |
| Veterinarian Inactive License >90 days Texas.gov fee Gov't Code 801.154 | $5 per online renewal | 8 | $40 | Texas.gov |
| Veterinarian Inactive License >90 days late Peer Assistance Fee Gov't Code 801.154 | $4 per annual renewal | 8 | $32 | Peer Assistance Program |
| Veterinary Inactive current renewal fee Gov't Code 801.154 | $161 per annual renewal | 735 | $118,334 | General Revenue |
| Veterinary Inactive current renewal Texas.gov fee Gov't Code 801.154 | $5 per online renewal | 735 | $3,675 | Texas.gov |
| Veterinary Inactive current renewal Peer Assistance Fee Gov't Code 801.154 | $4 per annual renewal | 687 | $2,748 | Peer Assistance Program |
| Veterinary Status Change Fee Gov't Code 801.154 | $55 per change | 3 | $155 | General Revenue |
| Veterinary Temporary License Gov't Code 801.154 | $300 per request | 13 | $3,900 | General Revenue |
| Data Lists Request Gov't Code 801.154 | $50 per request | 72 | $3,600 | Appropriated Receipts |
| Duplicate License Request Gov't Code 801.154 | $40 per request | 36 | $1,440 | Appropriated Receipts |
| Equine Dental Provider – Certification Gov't Code 801.154 | $1500 per application | 1 | $1,500 | General Revenue |
| Administrative Penalties Gov't Code 801.154 | Varies per penalty | Unknown | $94,050 | General Revenue |

**Exhibit 7: Fee Revenue**

# VI. Organization

**A.    Provide an organizational chart that includes major programs and divisions, and shows the number of FTEs in each program or division.  Detail should include, if possible, Department Heads with subordinates, and actual FTEs with budgeted FTEs in parenthesis.**

**Texas State Board of Veterinary Medical Examiners**
**Exhibit 8:  Organizational Chart**



*Exhibit 8:  Organizational Chart*

**B.    If applicable, fill in the chart below listing field or regional offices.**

This is not applicable as the Board does not have field offices.

**Texas State Board of Veterinary Medical Examiners**
**Exhibit 9:  FTEs by Location — Fiscal Year 2014**

| Headquarters, Region, or Field Office | Location | Co-Location? Yes / No | Number of Budgeted FTEs FY 2014 | Number of Actual FTEs as of August 31, 2014 |
|---|---|---|---|---|
| Headquarters / Central | Austin | No | 18 | 16 |
| | | **TOTALS:** | **18** | **16** |

*Exhibit 9:  FTEs by Location*

**C.    What are your agency's FTE caps for fiscal years 2014–2017?**

FY14 = 18 FTEs

FY15 = 18 FTEs

FY16 = 20 FTEs

FY17 = 20 FTEs

**D.    How many temporary or contract employees did your agency have as of August 31, 2014?**

This is not applicable as the board did not have any temporary or contract employees as of August 31, 2014.

**E.    List each of your agency's key programs or functions, along with expenditures and FTEs by program.**

**Texas State Board of Veterinary Medical Examiners**
**Exhibit 10:  List of Program FTEs and Expenditures — Fiscal Year 2014**

| Program | Number of Budgeted FTEs FY 2014 | Actual FTEs as of August 31, 2014 | Actual Expenditures |
|---|---|---|---|
| Licensing | 4.75 | 4.25 | $220,735.40 |
| Inspection and Enforcement | 13.75 | 11.75 | $628,769.62 |
| **TOTAL** | **18** | **16** | **$849,505.02** |

*Exhibit 10:  List of Program FTEs and Expenditures*

## VII. Guide to Agency Programs

**A.  Provide the following information at the beginning of each program description.**

*Name of Program or Function: Licensing and Enforcement*

*Location/Division: Austin*

*Contact Name: Marilyn Hartman, Director of Licensing and Karen Phillips, Director of Enforcement*

*Actual Expenditures, FY 2014: See Exhibit 10 List of Program FTEs and Expenditures above.*

*Number of Actual FTEs as of June 1, 2015: 18*

*Statutory Citation for Program: Licensing – Subchapter F Sections 801.251 – 801.266 of the Texas Occupations Code; Enforcement – Sections 801.401 and 801.402 and Subchapters I through K of Chapter 801 of the Texas Occupations Code*

**B.  What is the objective of this program or function?  Describe the major activities performed under this program.**

Licensing and Examination Division

The Licensing and Examination Division is charged with ensuring that only those persons who have demonstrated the ability to meet or exceed the minimum qualifications required to be licensed in the state of Texas and provide veterinary services to Texas's citizens.

In order to receive a license as a veterinarian (DVM) to practice veterinary medicine in this state, a person must demonstrate that they are at least 18 years of age; have obtained at least a passing score on the North American Veterinary Licensing Examination (NAVLE), or its predecessors (the National Board Exam and the Clinical Competency Test), and the State Board Exam (SBE); and have graduated from a school or college of veterinary medicine that is approved by the Board and accredited by the Council on Education of the American Veterinary Medical Association (AVMA).  Applicants who did not graduate from an AVMA-accredited veterinary college must possess a certificate of completion from the Educational Commission for Foreign Veterinary Graduates (ECFVG) or the Program for Assessment of Veterinary Education Equivalence (PAVE). The Licensing and Examination Division is responsible for reviewing and verifying that these requirements are met, for assisting prospective licensees with the application process to take the NAVLE, and for administering exams necessary for the various types of veterinary licenses.

To be eligible for licensure as a licensed veterinary technician (LVT) in this state, an applicant must present satisfactory proof to the Board that the applicant is at least 18 years old, has obtained at least a passing score on the Veterinary Technician National Exam (VTNE) and the Licensed Veterinary Technician Exam (LVTE), and is a graduate of an AVMA-accredited veterinary technician program. A person must first take and pass the VTNE in order to apply for the LVTE.  The Licensing and Examination Division is responsible for reviewing and verifying that these requirements are met.

To be eligible for licensure as an equine dental provider (EDP), an applicant must present satisfactory proof to the Board that the applicant is at least 18 years old, has obtained at least a passing score of 85 on the Equine Dental Provider Exam (EDPE), and is certified by the International Association of Equine Dentists or other Board-approved entity. The Licensing and Examination Division is responsible for reviewing and verifying that these requirements are met.

The Licensing and Examination Division is also responsible for the annual renewal of all licenses issued by this Board. Staff of this division review each application and on-line renewal report to ensure that continuing education requirements are met, licensees are in compliance with applicable laws, and that fees are submitted prior to issuing a renewal certificate.

Enforcement Division

The Enforcement Division conducts investigations based on complaints received from the public. Upon determining that the Board has jurisdiction to open a case, investigators contact complainants and respondents to explain the investigative process. Investigators conduct interviews as needed and obtain necessary documentation. This information is used to prepare a Report of Investigation for presentation to a staff enforcement committee or to the board member enforcement committee for review. The director of enforcement and investigators participate in both staff conferences and informal conferences. Both conferences make determinations regarding whether or not violations have occurred. Both conferences make recommendations regarding disciplinary actions if a determination has been made that a violation has occurred.

Investigations bring about disciplinary actions in cases where violations are found. This is intended to result in improvement from the licensee and more confidence for the public that the regulatory function is effectively ensuring safety for their animals as they receive veterinary care. Even when violations are not found, the licensee's experience of going through the investigative process can prove to be a learning opportunity for the respondent in that it provides some insight that might not have been gained otherwise. For example, insight on particular treatment methods and practices offered by board veterinarians during informal conferences are often enlightening and helpful for the licensee.

Investigators conduct unannounced visits to ensure compliance with Board Rules and the Veterinary Licensing Act by the licensed veterinary community and licensed equine dental providers.

Inspections generate a significant number of investigations (cases) when serious non-compliance problems are discovered. The most serious and most common cases generated from inspections involve problems with controlled substances. Inspections also bring to the attention of the Board some serious problems with licensees that have psycho-social issues that bring into question their fitness to practice. There is a small contingent of licensees that generally function in isolation from the veterinary community at large. Without inspections, troubled isolated licensees can go unnoticed for lengthy periods of time, while posing some risks to the public due to their non-compliance to rules and lack of knowledge of ever changing veterinary practice standards.

Enforcement staff receives calls from many veterinarians with inquiries based on real time problems that need accurate and expedient guidance regarding the Veterinary Licensing Act and Board Rules. Staff diligently assists licensees with such requests.

**C.** **What evidence can you provide that shows the effectiveness and efficiency of this program or function?  Provide a summary of key statistics and outcome performance measures that best convey the effectiveness and efficiency of this function or program.**

### Fiscal Year 2014 Enforcement Performance Measures

| Performance Measure | FY 2014 | FY 2014 Target |
|---|---|---|
| Average Time for Complaint Resolution | 204 | 225 |
| Number of Jurisdictional Complaints Received | 525 | 395 |
| Number of Compliance Inspections | 766 | 600 |
| Number of Complaints Resolved | 438 | 402 |
| Percentage of Licensees with  No Recent Violations | 96.33% | 97.00% |
| Percentage of Complaints Resulting In Disciplinary Action | 31.74% | 33.40% |
| Recidivism Rate for Those Receiving Disciplinary Action | 27.42% | 10.00% |
| Percentage of Documented Complaints Resolved within 6 months | 45.64% | 40.00% |

**D.** **Describe any important history regarding this program not included in the general agency history section, including how the services or functions have changed from the original intent.**

The original intent was not based largely on companion animal veterinary care as it is today.  Originally there was a greater focus on public health and food production animals.  Most cases currently are related to veterinary care received by a particular family pet.  With the increase in specialty medicine, it is not uncommon for the care of one family pet to generate cases on several veterinarians that have been care providers.  The public sentiment regarding animal welfare has also made a dramatic shift. Expectations regarding treatment outcomes has risen with the cost of veterinary care. Available treatments options have greatly expanded.

The model of veterinarians affiliating with shelters, TNR (trap/neuter/release) clinics, low-cost spay/neuter clinics, rescue groups, and other animal rights and activist organizations has developed over the past few decades. A lack of oversight and other problems have appeared with some of these entities since they did not exist when the original legislation was drafted. Members of the public often assume the Board has jurisdiction over such entities as they discover problems. Although we may or may not have jurisdiction over the actions of a veterinarian in those environments, we do not have legal authority to oversee the entity itself as is often assumed by the complaining public.

**E.** **Describe who or what this program or function affects.  List any qualifications or eligibility requirements for persons or entities affected.  Provide a statistical breakdown of persons or entities affected.**

The public and public health, licensees and staff, animals, veterinary care.  [Expand and seek advice on stats]

**F.     Describe how your program or function is administered.  Include flowcharts, timelines, or other illustrations as necessary to describe agency policies and procedures.  Indicate how field/regional services are used, if applicable.**

<u>Licensing</u>

The program is administered by the Director of Licensing and Examinations, who reports to the Executive Director and supervises 2 License and Permit Specialists.  In addition, an Administrative Assistant II is assigned half time. The Board issues three types of licenses.  Each license type has its own requirements that must be met by applicants.

Applicants may apply for:

*Regular License*
A regular license is issued to any applicant who has met basic application prerequisites and requirements and has passed the Texas State Board Examination (SBE). These licenses have no restrictions or limitations.

> *Procedure*
>
> Upon receipt of a completed application with supporting documentation, as applicable, by the deadline set by Board Rule, the applicant is assigned to the next regularly scheduled examination and advised in writing.  The applicant is then given instructions on how to schedule the exam with eStrategy Solutions, our third-party vendor for the exam.  Board Rule requires a completed application at least 45 days prior to the exam date.  An item analysis of the exam is also provided to ensure that proper questions are posed and accurate answers are keyed.  Upon passing the licensing examination, a regular license is issued within 10 days after administration of the exam.  The license must be renewed the year following original issuance. Late fees apply if not timely renewed, and, after one year of non-renewal, the license is cancelled for failure to renew, as required by law.

*Special License*
A special license is a limited license issued to applicants who meet basic licensing requirements and prerequisites as set out by law and rule. This license is available only to veterinarians. They must be a member of the faculty or staff of a board-approved veterinary program at an institution of higher education, or employed at either the Texas Animal Health Commission or the Texas Veterinary Medical Diagnostic Laboratory.  Special licenses may also be issued to those applicants whose specialty has been determined by the Board to be un-represented or under-represented in the State of Texas. Examples of the latter are zoo veterinarians, poultry specialists who are employed by large poultry operations, and research organizations.

> *Procedure*
>
> A special license examination is given on an as-needed basis by appointment only, and the applicant, upon passing the examination, is issued a special license within 24 hours.  The license must be renewed the year following issuance. A late fee applies if it is not renewed by the expiration date. After one year of non-renewal, the license is cancelled.  If the individual

terminates employment with the entity for which such special license was issued, the license automatically becomes null and void.

*Provisional License*

This license is only available to veterinarians. The provisional license opportunity was created in order to bridge the gap between examinations and to allow qualified veterinarians who are licensed in another state and meet basic requirements and prerequisites as set out by law and rule to practice while waiting to take the regular license examination. Once a provisional license has been obtained, the individual is scheduled and must take and pass the regular license exam. Failure to do so renders the provisional license null and void, it is not renewable nor can a second provisional license be issued. The individual will have to apply for regular license at that point.

*Procedure*

Upon receipt of a provisional license application with supporting documentation, the information and material submitted is reviewed and processed. Study material is provided to the applicant along with a choice of examination dates and times. The provisional license exam is given at least two times per month by appointment only.

After the applicant has completed the examination, the answers are hand-graded while the applicant waits. If the applicant passes, a provisional license number is issued right away and are able to practice immediately. At that time, the applicant is also scheduled for the next available regular license examination. This license is not renewable and cannot be re-issued. Upon passing the regular license examination, the regular license becomes the permanent license. Should the applicant decide to discontinue the pursuit of a regular license, the provisional license is cancelled and the individual is no longer considered licensed in the State of Texas.

Attachments 15 – 17 provide an overview of each process, but they do not depict all possibilities that could exist or arise.

## Enforcement

### HOW THE BOARD HANDLES COMPLAINTS AGAINST LICENSEES

**Phase 1 (3 – 5 months):**

**1.      Written Complaint Received -** A complainant is the person who files a complaint. The licensee or person practicing without a license against whom the complaint is made is the respondent. All complaints must be submitted in writing on the Board's complaint form. Complaints may be submitted by mail, fax, or email. The Director of Enforcement assigns the complaint to an investigator unless the complaint is found to be non-jurisdictional.

**2.      Complaint Investigated -** The investigator sends a summary of the allegations to the respondent and requests a written response to the complaint along with related patient records be submitted to the Board within 21 days. After the respondent's response is received, the Board will send a copy of the response to the complainant along with notification that the complainant may submit additional comments. The Board will provide a copy of the complainant's comments to the respondent. Upon completion of the investigation, the investigator prepares a report of investigation

which is forwarded to the Director of Enforcement. If the Director of Enforcement determines from the report that the probability of a violation exists that involves medical judgment or practice, the report will be forwarded to the Executive Director. If the Executive Director concurs, the Director of Enforcement will forward a copy of the report and complaint file to two veterinarian Board members who will review the case. Non-medical cases will be heard at staff conference by the staff Enforcement Committee comprised of the Executive Director, General Counsel, and the Director of Enforcement. A determination will be made to either dismiss, investigate further, or settle (if a violation is found).

**Phase 2 (1 – 3 months):**

**3.**     **Review by Veterinarian Members -** The two veterinarian members review the case and make a determination that:

> a.   A violation may have occurred;
>
> b.   No violation has occurred;
>
> c.   There is insufficient evidence to confirm that a violation occurred; or
>
> d.   Further investigation is required.

The veterinarian members' decisions are sent to the Director of Enforcement.

**4.**     **No Violation Found -** If the medical review determines that there is no violation, then letters are sent to the complainant and respondent informing them that the case is closed to no violation.

**Appeal of Determination of No Violation or Insufficient Evidence -** Following receipt of the notice of dismissal of a complaint, the complainant may appeal the dismissal. To do so, the appeal must:

a.   Be in writing;

b.   Be received in the Board office no later than the 60th date of the complaint dismissal notification; and

c.   List the reason(s) for the appeal and provide sufficient information to indicate that additional review is warranted.

A complainant may appeal a finding of no violation only one time.

**5.**     **Violation May Have Occurred -** If the medical review finds that a violation may have occurred, the General Counsel will prepare written allegations of the violations. An informal conference is scheduled.

**6.**     **Notice to Parties -** The General Counsel mails a letter to the licensee transmitting the allegations and inviting the licensee to an informal conference to discuss the complaint. The complainant is also notified of the conference and is given a copy of the allegations. The respondent and complainant are notified at least two weeks in advance of the date of the scheduled informal conference. Any telephonic notice will be confirmed in writing. The written notice will include a copy of the allegations that will be discussed at the conference. Neither the respondent nor the complainant are compelled to attend. The respondent may, in writing, waive his right to attend the conference.

**Phase 3 (1 – 5 months):**

**7.      Informal Conference -** The informal conference is the final step in the investigation of a case.   It is held with the Board's Enforcement Committee which is usually comprised of two veterinarian Board members, a public member of the Board, Executive Director, Director of Enforcement, the investigator assigned to the case, and the Board's General Counsel. The Executive Director normally chairs the conference. In most instances the respondent is present and may be represented by legal counsel. The complainant may be present. No other parties are allowed in the conference unless their presence will substantially benefit the development of the facts. This will be determined by the Executive Director.

The purpose of the informal conference is to review the allegations in detail and develop the facts of the case after receiving input from the complainant and respondent. An informal conference is not a formal hearing, and the Enforcement Committee is not the final decision maker or finder of fact. The makeup of the Committee is intended to ensure a fair disposition of complaints.

Following a thorough discussion of the case, the Committee excuses the parties and meets in private to determine whether the alleged violations are accurate and to formulate a recommendation. The Committee may:

    a.   Find that there is no violation or insufficient evidence on which to find a violation;

    b.   Continue the investigation because additional information may be available which the Committee needs to make a decision, or information was obtained during the conference that substantially changes the allegations discussed; or

    c.   Find that a violation has occurred and discuss sanctions that it will recommend to the Board.

**8.      Committee Determination -** The respondent returns to the conference and is informed of the results of the deliberation. If the Committee has found that a violation occurred, the complainant will be informed and the recommended sanction is presented to the respondent.

The respondent is not required to accept or reject the proposed sanction at this time.

**9.      No Violation Found -** The parties to the complaint are notified verbally, and later in writing of the decision and the case is closed.

**10.      Violation Found –** The parties to the complaint are verbally notified that a violation was found. The General Counsel drafts the alleged violations and proposed sanctions into an Agreed Order which is mailed to the respondent. The respondent, within the specified time, is to accept or reject the Agreed Order.

**11.      Respondent Accepts the Agreed Order -** By signing the Agreed Order, the respondent agrees not to contest the allegations and accepts the proposed sanctions. The signed Order is then returned to the Board for formal consideration at its next regularly scheduled meeting.

**Phase 4 (1 – 5 months):**

**12.      Board Action (Agreed Order) -** The signed Agreed Order is considered by the Board. Final action on the Order is taken during public deliberations of the Board, but the Board may go into executive session to discuss the Order. In most cases the Board approves the Order without change, but the Board may also amend the Order or reject it.

If the Board amends the Order, the General Counsel will mail the amended Order to the respondent who then has fourteen (14) days from receipt to accept it by signing and returning it to the Board, or reject it. If the respondent rejects the amended Order, the case will be presented to an administrative law judge for a formal hearing.

**Phase 5 (1 – 18 months):**

**13.     Respondent Rejects the Allegations and/or Sanctions in the Agreed Order -** If the respondent declines to sign the Agreed Order, the Legal Department then refers the case to the State Office of Administrative Hearings for setting of a "contested case" administrative hearing and prepares a Notice of Hearing containing the complaint allegations which is then mailed to the respondent. .

**14.     Administrative Hearings -** Impartial Administrative Law Judges (ALJs) are employed by the State Office of Administrative Hearings to conduct hearings on contested cases.  The hearing is conducted much like a trial in district court, and rules of evidence apply to the proceedings. The respondent is entitled to the assistance of legal counsel. The Board is represented at the hearing by the Legal Department and/or an Assistant Attorney General. The parties are allowed to present relevant evidence (including witnesses) on the issues. The ALJ may question any witnesses. After the hearing, the ALJ will prepare a Proposal for Decision (PFD).

**15.     The Proposal for Decision -** The ALJ's PFD will contain findings of fact (based on the testimony and evidence received) and conclusions of law (which include the relevant sections of the law involved in the case on which a violation may or may not be found). The PFD is presented to the Board and the respondent and any other named parties. Each party is allowed to file exceptions to the findings and conclusions contained in the PFD. The PFD and any exceptions are then sent to the Board for consideration and action.

**16.     Board's Actions on Proposal for Decision -** The Board usually accepts the findings of fact and conclusions of law contained in the PFD.  The Board may modify a findings of fact or conclusion of law only under strict legal guidelines. The Board will issue a final order containing the findings and conclusions and assessing sanctions, if indicated.

**Appeal of Board Decisions -** If the respondent objects to the findings of fact and/or conclusions of law contained in the PFD, or to the Board's action, the respondent may file a motion for rehearing with the Board. If the motion is declined, the respondent may appeal the case to the district courts of Travis County, Texas. From this point, the case is handled like any other civil matter.

**G.     Identify all funding sources and amounts for the program or function, including federal grants and pass-through monies.  Describe any funding formulas or funding conventions. For state funding sources, please specify (e.g., general revenue, appropriations rider, budget strategy, fees/dues).**

The General Revenue Fund is the source of funding for the Licensing and Enforcement Divisions. The Board is self-supporting. The Texas State Board of Veterinary Medical Examiners generates sufficient revenues from licensing and examination fees to support its operations.  Fees are collected through the renewal process to pay for the Texas.gov and the Peer Assistance programs.  Excess fees collected for the Peer Assistance program are transferred to the States' General Revenue.  The licensing program is appropriated $4,300 in the agency's bill pattern from fees collected for reimbursement of copies.

**Texas Board of Veterinary Medical Examiners**
**Exhibit 11 List of Program Funding**

| General Revenue Funding By Board Program | | |
|---|---|---|
| Program | FY2016 | FY2017 |
| Operate Licensing System | $229,159 | $229,159 |
| Appropriated Receipts | $4,300 | $4,300 |
| Texas.gov | $40,000 | $40,000 |
| Total Licensing Program | $273,459 | $273,459 |
| | | |
| Complaints and Action | $866,351 | $866,353 |
| Peer Assistance | $30,000 | $30,000 |
| Total Complaints and Action Program | $896,351 | $896,353 |
| | | |
| Licensing Indirect Admin | $35,000 | $35,000 |
| Complaints and Action Indirect | $85,000 | $85,000 |
| Grand Total | $1,289,810 | $1,289,812 |

*Exhibit 11:  List of Program Funding*

**H.   Identify any programs, internal or external to your agency, that provide identical or similar services or functions to the target population.  Describe the similarities and differences.**

Licensing

There are no similar services or functions with regards to licensing of veterinarians, veterinary technicians, and equine dental providers.

Enforcement

The primary similarity of services is related to the oversight of Controlled Substances(CS) and CS records, and is between the Board, Texas Department of Public Safety (DPS) and the U.S. Drug Enforcement Agency (DEA).  The Texas criminal statues related to CS offenses fall to DPS for potential criminal charges and federal criminal statutes to DEA. However, both entities rely heavily on the Board to monitor and discover such problems since we have more contact with our licensees in their clinic environments than DPS and DEA. Local law enforcement agencies also work controlled substance cases, jointly or independently, involving veterinary licensees.

Any Texas local law enforcement agency (city police departments, sheriff's departments, and even constables) has jurisdiction in criminal offenses within their particular locale regarding violations of the Veterinary Licensing Act.  However, we do not find that they often work criminal cases involving the Veterinary Licensing Act.

The Board often contacts local law enforcement to encourage them to work Practicing Veterinary Medicine/Equine Dentistry Without a License cases that have come to our attention via a written complaint.  The offense is a class A criminal offense.  If the case is worked as a criminal offense, there can be significant consequences for the actor(s).  The offenses can pose significant risks to the public. If the Board has to work a Practicing Without a License case administratively without a criminal case, the result is typically that the offender signs a cease and desist order agreeing to discontinue in the

criminal activity. If there is a subsequent offense, the OAG's office gets involved at our request, and a significant fine could be imposed.

Texas Department of State Health Services (TDSHS), particularly Zoonosis Control Division, has jurisdiction regarding rabies vaccination and prevention protocols and regulations. However, the Board receives a large number of calls from veterinarians requesting advice when a critical rabies incident occurs. We have board rules regarding rabies, but they follow protocols set forth by TDSHS.

**I.    Discuss how the program or function is coordinating its activities to avoid duplication or conflict with the other programs listed in Question H and with the agency's customers. If applicable, briefly discuss any memorandums of understanding (MOUs), interagency agreements, or interagency contracts.**

Licensing

As answered in Question H, there are no similar services or functions with regards to licensing of veterinarians, veterinary technicians, and equine dental providers, so there is no need to coordinate activities with other programs.

Enforcement

Circumstances with individual investigations can cause the Board to contact DPS or DEA for assistance; however, we do not have any MOUs or other interagency agreements with those agencies. If the Board has information about a licensee that indicates criminal charges might be expected, we are likely to contact DPS or another law enforcement agency to work the case jointly or independently. The Board attempts to avoid investigative actions that could potentially interfere with criminal prosecutions. Criminal investigations conducted by any law enforcement agencies in Texas, (whether state, local, or federal) take precedence over the Board's administrative cases.

**J.    If the program or function works with local, regional, or federal units of government, include a brief description of these entities and their relationship to the agency.**

Licensing

The licensing of veterinarians, veterinary technicians, and equine dental providers does not involve other local, regional, or federal units of government. However, our licensees have the option to utilize the Texas.gov online renewal system for annual renewals.

Also, a coordinated effort between this program, the Office of the Attorney General, and Texas Guaranteed Student Loans ensures that licensees currently in default of a student loan or child support are not able to renew a license issued by this Board.

The Texas Guaranteed Student Loan Corporation (TG) was established under Texas Education Code Chapter 57 to administer a guaranteed student loan program and to provide necessary and desirable services related to the loan program. This Board is required to submit to TG a list of all active licensees on a quarterly basis. From this list, TG identifies the persons who are in default on loans guaranteed by the corporation and reports those persons to the department. Section 57.491, Loan Default Ground for Non-renewal of Professional or Occupational License, of the Texas Education Code, states that we shall not renew the license of a licensee whose name is on the list provided by the corporation unless the licensee presents to us a certificate issued by TG certifying that the licensee has

entered a repayment agreement on the defaulted loan or the licensee is no longer in default on a loan guaranteed by the corporation.

Texas Family Code §232.0135 "Denial of License Renewal" provides that "(a) a child support agency, as defined by Section 101.004, may provide notice to a licensing authority concerning an obligor who has failed to pay child support for six months or more that requests the authority to refuse to accept an application for renewal of the license of the obligor. (b) A licensing authority that receives the information described by Subsection (a) shall refuse to accept an application for renewal of the license of the obligor until the authority is notified by the child support agency that the obligor has: (1) paid all child support arrearages; (2) established with the agency a satisfactory repayment schedule or is in compliance with a court order for payment of the arrearages; (3) been granted an exemption from this subsection as part of a court-supervised plan to improve the obligor's earnings and child support payments; or (4) successfully contested the denial of renewal of license…".

Upon notification of a default on student loan payments or child support payments, the Director of Licensing will initiate a referral to the Enforcement Division. Pursuant to Rule 573.78, a licensee who has defaulted on a student loan or failed to pay child-support may be subject to disciplinary action by this Board.

Enforcement

DEA, DPS, and TDSHS relationships with the Board are described above in Sections H and I. The Office of the Attorney General (OAG) is called upon by the Board for assistance in enforcement matters when a cease and desist order has been violated by a non-licensee that previously was found in violation of the Veterinary Licensing Act by practicing veterinary medicine without a license. OAG also represents the Board in district court cases.

The Board has been called upon to share information with USDA particularly on cases involving the interstate transport of animals or interstate distribution of controlled substances. This is a rare occurrence. However, the new 'green hunting' interest may increase our contact with federal agencies and other state veterinary boards. The Board has worked with the Oklahoma State Veterinary Board on a variety of cases. The Board has also communicated with Louisiana state agencies regarding intelligence information on individuals reported to be Practicing Without a License in Texas that have Mexican cartel connections and that are active in the Louisiana horse racing business. The Board has met with Texas Animal Health Commission investigators regarding shared safety concerns and other common interests.

The Texas Racing Commission requests our assistance a few times a year to accompany them to racetracks on race days. We can be used as a resource if questions arise regarding the appropriateness of actions taken by veterinarians that are working on horses at the venue.

The American Association of Veterinary State Boards ("AAVSB") maintains a national database that most state veterinary boards, including Texas, report disciplinary actions to. We are notified by AAVSB when one of our licensees has had disciplinary action taken against them by another state board and based on that information we evaluate the disciplinary action and may open a case against that licensee.

**K.   If contracted expenditures are made through this program please provide:**

- **a short summary of the general purpose of those contracts overall;**
- **the amount of those expenditures in fiscal year 2014;**
- **the number of contracts accounting for those expenditures;**
- **top five contracts by dollar amount, including contractor and purpose;**
- **the methods used to ensure accountability for funding and performance; and**
- **a short description of any current contracting problems.**

There are two contract expenditures made through the Board's programs. The licensing program has contracted services with Texas.gov and the enforcement program has contracted services with the Peer Assistance Program.

<u>Texas.gov – Licensing Strategy</u>

The Texas.gov contract is the agent that allows the Board to accept credit card payments for license renewals. The Board's bill pattern allocated for FY2014 and FY2015 $35,000 each fiscal year, for FYs 2016 and 2017 the allocated amount increased to $40,000 each fiscal year.

A $5.00 fee is collected for on-line renewals for the Texas.gov contract are deposited into a designated appropriation account, (Appropriation # 00007). These funds are transferred to Texas.gov monthly, all funds deposited into this appropriation are passed to Texas.gov due to appropriated authority in HB 1 GAA Article VIII, Section 4 Texas.gov appropriation.

There are currently no contracting problems with this vendor.

<u>Peer Assistance Program – Complaints and Action Strategy</u>

The peer assistance program contract provides various programs for veterinarians impaired by chemical dependency or mental illness. The Board's bill pattern allocated for FY2014 and FY2015 $30,000 each fiscal year, for FYs 2016 and 2017 the allocated amount remains at $30,000 each fiscal year.

A $4.00 fee is collected from on-line renewals for the peer assistance program contract and are deposited into a designated appropriation account, (Appropriation # 00006). The Board has a firm fixed price contract with the vendor and the monthly invoice for this service is $2,500 a month or $30,000 per fiscal year. If excess funds are collected for the contract the excess is transferred to the State's general revenue.

There are currently no contracting problems with this vendor. Currently this contract is out for re-bid.

**L.   Provide information on any grants awarded by the program.**

This is not applicable as no grants are awarded by the program.

**M.  What statutory changes could be made to assist this program in performing its functions?  Explain.**

<u>Licensing</u>

The Licensing Program does not anticipate any statutory changes at this time.

<u>Enforcement</u>

The Board has had some serious, sometimes long term, problems with licensees that seem unfit to practice due to age or health-related physical and/or mental impairments, and impairments due to mental illness.  A brief description of the following 4 licensees (identified as A, B, C, and D) are presented  as examples of the Board's serious 'fit to practice' issues and its inability to handle the situations well, due to a lack of statutory authority. A better solution is to have clear statutory authority to send licensees with potential fitness to practice problems to third party medical reviewers to more quickly deal with these issues.

Dr. A was a diabetic stroke victim with obvious mental and physical limitations.  There were numerous standard of care complaints against him. Dr. A had an office that was in his house.  It was separated from his kitchen by short swinging doors.  His normal routine was to sit in the kitchen/great room area and verbally communicate with his two veterinary technicians, one being his wife. Dr. A had 18 complaints with the Board and 17 of those were in the last 3 years of his career.  Cases were also opened on the two veterinary technicians for practicing without a license. He refused to surrender his license, which was ultimately revoked.  There was a significant risk to the public during the three years it took to revoke his license.

Dr. B had a continuing education violation in 2012 and a violation of board order in 2013.  The Board's staff received numerous calls from Dr. B when he tried to renew his license the last two times. He was clearly confused, thinking that they were telephone operators, and was extremely forgetful. Two board investigators went to inspect him and he threatened to cut an investigator's hand.  His family intervened and tried to get Dr. B to surrender his license, but he refused.  The family was unwilling to have him declared mentally incompetent by a judge. Ultimately he was unable to renew his license when he was unable to provide proof of continuing education.

Dr. C had two standard of care complaints against him in 1990 and 1997.  He had a complaint in 2011 about him abusing animals.  He agreed to a mental health evaluation that revealed some significant problems. The Board did not have authority to order a mental health evaluation if Dr. C had refused. This case was resolved due to the efforts of a veterinarian friend, and Dr. C became convinced that it was time for him to sell his practice, which he did.  He then surrendered his license.

Dr. D was contacted during an inspection.  The investigator was shocked to find a severe sanitation problem in the clinic and later a hoarding of materials and animals situation in her 3 neighboring houses.  Local law enforcement had been dealing with her prior to the 2013 inspection.  Ultimately, Dr. D surrendered her veterinary license.  She was later arrested on animal cruelty charges.

The Board has also recently been dealing with two other veterinarians whose hoarding of animals and animal cruelty problems have resulted in criminal charges.

Section 801.004(1) (the "owner exemption") of the Texas Occupations Code has generated litigation in regard to its interpretation and application to licensees.  Specifically, in cases where a shelter or

rescue group owns an animal, some have argued that the employed or volunteer veterinarian is not regulated by the Veterinary Licensing Act because the veterinarian is either the owner, the employee, or the designated caretaker and is, thus, exempt from the Veterinary Licensing Act. This interpretation has been successful in at least one case before an Administrative Law Judge. Further, such interpretation means that a licensee is permitted, in certain circumstances, to practice veterinary medicine without any oversight or regulation by the entity that licensed him or her. To our knowledge, no other profession provides its licensees with such an exemption. The Board believes that such interpretation is simply an attempt to circumvent the Veterinary Licensing Act and is not permitted. The interpretation would also lead to an absurd result as the Veterinary Licensing Act does not define a "designated caretaker;" therefore, any individual (licensed or not) who is asked by an owner to provide veterinary care to an animal would be exempt from the Act. As that would include all veterinarians and individuals practicing veterinary medicine without a license, the Veterinary Licensing Act essentially would be rendered moot. Statutory changes to the owner exemption would allow the Board to know definitively when veterinarians are within its regulatory jurisdiction rather than continue in litigation.

**N.   Provide any additional information needed to gain a preliminary understanding of the program or function.**

We have no additional information.

**O.   Regulatory programs relate to the licensing, registration, certification, or permitting of a person, business, or other entity. For each regulatory program, if applicable, describe:**

- **why the regulation is needed;**
- **the scope of, and procedures for, inspections or audits of regulated entities;**
- **follow-up activities conducted when non-compliance is identified;**
- **sanctions available to the agency to ensure compliance; and**
- **procedures for handling consumer/public complaints against regulated entities.**

Licensing

Licensing of veterinarians, veterinary technicians, and equine dental providers is necessary to assure a uniform and stringent standard of veterinary medical practice in the state. A person practicing veterinary medicine in Texas is required to be licensed by sections 801.251 - .258, Texas Occupations Code. Licensing rules are contained in Rules 571.3-65 of the Board.

Enforcement

The Enforcement Division investigates all jurisdictional complaints. This is an essential function that is necessary for the Board to fulfill our mission to serve the public in matters related to veterinary medicine.

Enforcement also conducts inspections in order to ensure, as much as resources allow, that the veterinary community is compliant with the Veterinary Licensing Act and Board Rules. With some problems that are discovered during an inspection, the licensee can forward proof of compliance to the investigator, such as proof of continuing education if it was unavailable during the inspection. Other problems, such as deficiencies with controlled substances records or shortages, typically cause an investigation (case) to be opened on the licensee.

Violations found during an inspection, just as with a violation discovered based on a complaint from the public, can prompt actions against the licensee ranging from a 'voluntary compliance' closure, to an informal board order with or without a fine, and even to a license revocation. The disciplinary action recommendation depends on the severity of the infraction, and mitigating or aggravating circumstances. Repetition of the same infraction would be an example of an aggravating circumstance.

**P.     For each regulatory program, if applicable, provide the following complaint information. The chart headings may be changed if needed to better reflect your agency's practices.**

The Board does not regulate entities, only persons. For the statistic involving complaints resulting in disciplinary action, please note that many complaints may have more than one of the disciplinary actions, not just one (e.g. a reprimand and an administrative penalty).

**Texas State Board of Veterinary Medical Examiners**
**Exhibit 12:  Information on Complaints Against Regulated Persons or Entities**
**Fiscal Years 2013 and 2014**

|  | Fiscal Year 2013 | Fiscal Year 2014 |
|---|---|---|
| Total number of regulated persons | 8,136 | 9,269 |
| Total number of regulated entities | n/a | n/a |
| Total number of licensees inspected – onsite | 605 | 605 |
| Total number of licensees inspected – by mail | 286 | 281 |
| Total number of complaints received from the public | 282 | 268 |
| Total number of complaints initiated by agency | 181 | 232 |
| Number of complaints pending from prior years | 3 | 182 |
| Number of complaints found to be non-jurisdictional | 27 | 19 |
| Number of complaints resolved | 498 | 438 |
| Average number of days for complaint resolution | 283 | 204 |
| Complaints resulting in disciplinary action: |  |  |
| administrative penalty | 108 | 102 |
| formal reprimand | 51 | 71 |
| informal reprimand | 37 | 27 |
| probation | 7 | 17 |
| suspension | 8 | 17 |
| revocation | 1 | 13 |
| voluntary surrender | 9 | 3 |
| cease & desist | 33 | 30 |
| agreed permanent injunction | 0 | 1 |
| continuing education | 47 | 40 |

*Exhibit 12:  Information on Complaints Against Persons or Entities*

# VIII. Statutory Authority and Recent Legislation

## A.    Statutory Authority

*Texas State Board of Veterinary Medical Examiners*
*Exhibits 13a – 13b:  Statutes / Attorney General Opinions*

*Statutes*

| Citation / Title | Authority / Impact on Agency |
|---|---|
| Chapter 801, Texas Occupations Code | Board's enabling legislation that creates the Board; outlines its general and specific authority; outlines public interest information and complaint procedures; license and renewal of license requirements; outlines general disciplinary authority and procedure, including penalties and sanctions.<br><br>Authorized in 2011by HB 414 to license and regulate equine dental providers.<br><br>Authorized in 2013 by SB1312 to license and regulate licensed veterinary technicians. |
| Chapter 101, Texas Occupations Code | Creates the Health Professions Council to provide a means for the regulatory agencies represented on the council to coordinate administrative and regulatory efforts. Creates a toll-free telephone complaint system to provide assistance and referral services for persons making a complaint relating to a health profession regulated by the state and establishes a training program for the governing bodies of state agencies that regulate health professions. |
| Sec. 411.122, Texas Government Code | Authorizes the Board to obtain criminal history record information for an applicant for a license from the board. |
| TEX CR. CODE ANN. § 60.061 | Requires this Board to provide the Texas Department of Public Safety a list of each person licensed on a quarterly basis so that criminal history checks can be performed. |
| 10 CFR section 1300 *et seq.* | These regulations of the Federal Drug Enforcement Administration are based on the federal law 21 United States Code, Section 801 *et seq.*  Veterinarians must comply with these regulations. |
| 37 TAC 13.1 - .278 | These regulations are Texas Department of Public Safety rules requiring persons who distribute or prescribe controlled substances to register with the DPS and meet other regulatory requirements. |

| Citation / Title | Authority / Impact on Agency |
|---|---|
| 21 United States Code, Section 801 *et seq.* | This section of the Code contains the federal law on controlled substances, including schedules of controlled substances, and provides the basis for the Texas controlled substance statutes. Veterinarians must adhere to this statute in handling controlled substances. |
| Chapters 481, 483 and 485, Health and Safety Code | Chapters 481 and 483 relate to the classification, control and dispensing of controlled substances and dangerous drugs. Since veterinarians often control and dispense controlled substances in their practices, these statutes impact the Board's rules concerning controlled substances. Chapter 485 relates to the use of abusable volatile chemicals that may be possessed by veterinarians. A criminal conviction of a veterinarian under these chapters requires the Board to revoke the veterinarian's license. |

*Exhibit 13a: Statutes*

### Attorney General Opinions

| Attorney General Opinion No. | Impact on Agency |
|---|---|
| JM-46 (July 25, 1983) | TBVME is not required to exempt applicants who are licensed in another state from TBVME's examination requirements. TBVME is authorized to implement a reciprocal licensing system, and may consider any reasonable factors it deems relevant in making licensing determinations. |
| JM-339 (August 13, 1985) | This opinion helped clarify that veterinarians employed by governmental entities are not exempt from the licensing requirements in the Veterinary Practice Act. |
| DM-498 (December 22, 1998) | This opinion helped clarify the relationship of veterinarians and non-veterinarian business entities regarding the practice of veterinary medicine. The opinion led to changes in the Veterinary Licensing Act to allow legal sanctions against corporations or business entities that illegally practice veterinary medicine. |

| Attorney General Opinion No. | Impact on Agency |
|---|---|
| JC-0421 (October 3, 2001) | This opinion found that a veterinarian who has complied with the statutory notice requirements in section 801.357 of the Texas Occupations Code must release an animal to the owner upon the owner's demand within the first 12 days after mailing the notice. The animal is considered "abandoned" on the 13th day, and the veterinarian may dispose of the animal. A veterinarian who has not complied with the statutory notice requirements may not refuse to return the animal to its owner at any time. A veterinarian is required to provide necessary treatment to an animal in his or her custody, and is entitled to reimbursement of reasonable expenses for necessary treatment and boarding. |
| GA-0547 (May 10, 2007) | This opinion held that TBVME may adopt a rule prohibiting licensees from dispensing controlled substances without a Texas Department of Public Safety registration. TBVME did adopt such a rule and has enforced it. |
| ORD No. 683 (November 24, 2009) | This opinion clarified section 801.207 of the Act, regarding the Board's confidentiality provisions. The opinion found that complaints filed with TBVME and a licensee's response to the complaint are confidential and excepted from public disclosure under the Public Information Act. TBVME may send the licensee a copy of the complaint against them, and may send the complainant a copy of the licensee's response. TBVME may also send a copy of the licensee's response to a consulting veterinarian. |

*Exhibit 13b: Attorney General Opinions*

## B.    Legislation Enacted 84th Legislature

**Texas State Board of Veterinary Medical Examiners**
**Exhibits 14a – 14b: 84th Legislative Session**

*Legislation Enacted*

| Bill Number | Author | Summary of Key Provisions |
|---|---|---|
| HB7 | Darby | Otto | Howard | Turner, Sylvester | Murr | This bill abolished the additional professional fee for certain licensees, including veterinarians. |
| HB1740* | Senfronia Thompson | This bill provides that a veterinarian who is employed by a county or municipality or is working as part of a local rabies control program is not required to establish a veterinarian-client-patient relationship prior to administering or supervising the administering of a rabies vaccine. |

| Bill Number | Author | Summary of Key Provisions |
|---|---|---|
| SB195* | Charles Schwertner | This bill transfers the regulation of the official prescription program for certain controlled substances from the Department of Public Safety to the Texas State Board of Pharmacy (TSBP). The bill further permits the TSBP to collect fees to cover the costs of the program and requires the relevant licensing agencies to increase fees to cover the cost. |

**Exhibit 14a:  Legislation Enacted 84th Leg**

## Legislation Not Passed

| Bill Number | Author | Summary of Key Provisions / Reason Bill Did Not Pass |
|---|---|---|
| HB503 | Ryan Guillen | This bill would have provided the Board with the authority to commission peace officers.  Such authority would have allowed the Board to better investigate cases concerning people practicing veterinary medicine without a license.  It would also facilitate improved communications with law enforcement concerning shared cases. |
| HB859 | Eddie Rodriguez | This bill would have exempted anyone working for an animal shelter from the entire Veterinary licensing Act.  Several shelter bills were filed this session.  None of the bills passed as the stakeholders could not reach a consensus as to the language. |
| HB1274 | Lyle Larson | This bill would have made changes throughout the Veterinary Licensing Act to allow for certain protocols to occur within animal shelters.  Several shelter bills were filed this session.  None of the bills passed as the stakeholders could not reach a consensus as to the language. |
| SB1911 | Charles Perry | This bill would have made changes throughout the Veterinary Licensing Act to allow for certain protocols to occur within animal shelters.  Several shelter bills were filed this session.  None of the bills passed as the stakeholders could not reach a consensus as to the language. |
| SB1920 | Kirk Watson | This bill would have exempted anyone working for an animal shelter from the entire Veterinary Licensing Act.  Several shelter bills were filed this session.  None of the bills passed as the stakeholders could not reach a consensus as to the language. |
| SB1959 | Juan Hinojosa | This bill would have provided the Board with the authority to commission peace officers.  Such authority would have allowed the Board to better investigate cases concerning people practicing veterinary medicine without a license.  It would also facilitate improved communications with law enforcement concerning shared cases. |

**Exhibit 14b:  Legislation Not Passed 84th Legislature**

# IX. Major Issues

## 1. Confidentiality Statutory Provisions

**A.** The Veterinary Licensing Act has very simple language regarding confidentiality of board records that is insufficient to cover all of the intricacies of standard actions by the Board in the process of implementing the laws and rules of the Board.

**B.** Section 801.207 of the Texas Occupations Code states:

(i) Except as provided by Subsection (b), a board record is a public record and is available for public inspection during normal business hours.

(ii) An investigation record of the board, including a record relating to a complaint that is found to be groundless, is confidential.

- This statutory language does not address many questions that have come up in the daily functions of the Board. Specifically, questions concerning when a licensee may access what information regarding cases against him/her and how information should be handled through the administrative legal process and litigation. Importantly, the Board has questions regarding when information can be shared with law enforcement and how to handle public health information.

These issues affect the public in what information they are allowed to see in an open records request, the licensees in what information they are also allowed to see in an open records request, the applicants for licensure before the board, and the Board staff who need to have a clear and definitive answer to the everyday issues they encounter.

The Board attempted to have legislative action on this issue in 81st Legislative session (HB1562) and in the 82nd Legislative session. HB1802/SB1032 these bills did not pass.

The Medical Board and the Nursing Board seem to have addressed these issues in their enabling statute, and provide much more clarity than the 2 sentences the Veterinary Licensing Act has currently. See Section 164.007 of the Texas Occupations Code and Sections 301.206, .207, .414, .417, .418, .4521, .460, and .466 of the Texas Occupations Code. Their statutory language has been thoroughly discussed and litigated and works for their professions, which are very similar to the veterinary profession. These suggested changes reflect that language and will provide clarity to licensees, complainants, members of the public requesting open records and Board staff answering open records requests as well as Board attorneys filing contested cases. These changes are in furtherance of the policy previously set out by the Legislature that complaints where no violation was found remain confidential so as not to harm the reputation of the licensee. However, this clarity would allow the Board to share investigative records with other state and federal agencies to further protect the public. These changes would also reduce litigation resources, at our Board and the Office of the Attorney General, spent in determining what records are available to the public, complainants, and licensees. The Board staff will be more efficient without ambiguity in the statutory language. The drawbacks are that some interest groups are interested in hamstringing the Board's ability to regulate and relish the ambiguity in the statute. There is no fiscal impact to the proposed change, except less litigation (and ensuing litigation costs)

**2.    Fitness to Practice Statutory Provisions**

**A.**    The Veterinary Licensing Act has very simple language regarding mental incompetence jurisdiction that is insufficient to cover all of the intricacies of applying this principle in day to day Board actions.

**B.    Discussion**

Currently, under the Veterinary Practice Act, there is a conflict between Section 801.157(b) which allows the Board to order a veterinary licensee, who is subject to disciplinary action under the Act based on a finding that the veterinarian is impaired by chemical dependency or mental illness, to submit to care, counseling, or treatment through the peer assistance program and Section 801.405 which states that the Board may suspend or revoke a license if a court finds that the license holder is mentally incompetent. It also states that if a court determines that a person whose license is suspended or revoked under this section is mentally competent, the Board may reinstate the person's license. The Board has seen an increase in the number of licensees that have problems with dementia and are no longer fit to practice. These licensees present a risk to the public in that they are unable to practice veterinary medicine to an acceptable standard of care.

A potential solution is to add additional statutory language that would allow the Board on probable cause, to request the affected veterinarian or applicant to submit to a mental or physical examination by physicians designated by the Board (through the peer assistance program). The Board would be required to adopt guidelines, in conjunction with persons interested in or affected by this section, to enable the Board to evaluate circumstances in which a veterinarian or applicant may be required to submit to an examination for mental or physical health conditions, alcohol and substance abuse, or professional behavior problems. If the affected veterinarian refuses to submit to the examination, the Board would issue an order requiring the veterinarian to show cause why the veterinarian should not be required to submit to the examination, and schedule a hearing on the order not later than the 30th day after the date on which notice is served on the veterinarian. The veterinarian shall be notified by either personal service or certified mail with return receipt requested. At the hearing, the veterinarian and the veterinarian's attorney would be entitled to present testimony and other evidence showing that the veterinarian should not be required to submit to the examination. After a hearing, the Board would issue an order either requiring the veterinarian to submit to the examination or withdrawing the request for examination. The Board would refer a veterinarian or applicant with a physical or mental health condition to the most appropriate medical specialist for evaluation (as determined by the peer assistance program). The Board would not require a veterinarian or applicant to submit to an examination by a physician having a specialty specified by the Board unless medically indicated. The Board would not require a veterinarian or applicant to submit to an examination to be conducted an unreasonable distance from the person's home or place of business unless the veterinarian or applicant resides and works in an area in which there are a limited number of physicians able to perform an appropriate examination. The guidelines adopted under this section would not impair or remove the Board's power to make an independent licensing decision.

This potential solution would allow a qualified third party medical professional to evaluate licensees with potential mental health issues in a timely manner and in a non-public forum (unlike a court hearing on mental competency). This will provide protection to the public with regards to licensees that are unable to practice at a minimum standard of care as determined by mental health professionals. A similar solution is set out in Chapter 167 of the Texas Occupations Code for the Medical Board and Sec. 301.452, Physical and Psychological Evaluation, of the Texas Occupations Code for the Nursing Board. There is not a fiscal impact to the state for this proposed change.

3. **Veterinarians practicing in shelters and Owner Exemption Language in the Veterinary Licensing Act**

A.  Recent litigation has concerned the interpretation of the Veterinary Licensing Act's owner exemption. Specifically, an administrative law judge has found that a licensee veterinarian is exempt as to the Veterinary Licensing Act because she was a designated caretaker and an owner of the animals because she worked (but was not directly paid) at a shelter that legally owned the animals at issue

B.  When the Veterinary Licensing Act was enacted, the statutory language of the Act was not contemplating the model of a non-profit organization owning potentially thousands of animals and providing veterinary services with a licensee of the Board acting as an owner or designated caretaker for those animals. This model has developed in recent years and recent litigation has interpreted the Act as exempting the licensee from the Act where they are an owner, an employee of the owner or designated caretaker. The effect of this ruling, if upheld, will be to allow licensees in such scenarios to operate without a standard of care. Such ruling would impact the Board's treatment of veterinarians affiliated with shelters and rescue groups. The impact could be that an entire group of licensees are unregulated.

Further, the district court invalidated the Board's rule providing a definition of the term "designated caretaker" which defined one to not include a person who cares for an animal after an animal has already developed a condition. If this definition continues to be invalidated, the Board may have great difficulty enforcing any of its laws or rules. "Designated caretaker" would only be given a reasonable or common definition – one who is designated to provide care. Therefore, any person practicing veterinary medicine without a license would likely claim (and has in the past) that he/she is simply a designated caretaker as the animal's owner provided the animal to that individual for the individual to provide it with care. This argument is commonly used by individuals practicing veterinary medicine without a license. The same argument would also apply to any veterinarian or other licensee as all such individuals are generally designated to provide care to an animal by its owner, in the regular course of their business. This would be an absurd result, rendering the Act moot; however, it is certainly a possibility.

The Board simply wishes clarity in this issue. One suggestion has been made to simply clarify that every licensee is under the Veterinary Licensing Act and is not exempt. One non-profit has claimed that they would not be able to operate financially if they were required to operate under the rules of the Veterinary Licensing Act, specifically by having a veterinary-client-patient relationship established at the onset. This would require the employment of several licensed veterinarians. Many other similar nonprofits want to comply with the Veterinary Licensing Act and think that their veterinarians should not be exempt and should be held to a minimum standard of care. An attempt was made to resolve this issue in the last legislative session but the

interest groups were unable to come to an agreement on a solution. The only fiscal impact to the state with regards to this issue is a reduction in litigation costs and resources spent in litigation.

There is also an issue with intake vaccinations at shelters. The Veterinary Licensing Act sets out the requirement for the establishment of a veterinarian-client-patient relationship prior to any veterinary services being provided. It did not contemplate the unique situation in shelters where intake vaccinations (e.g. distemper, parvo, bordetella, but not rabies) need to be provided to animals upon intake/pickup so as to minimize the spread of disease among animals in the shelter environment. The Veterinary Licensing Act needs to be updated to address this situation in shelters.

**4.    Statutory Clarifications**

**A.**    The Veterinary Licensing Act has several issues that additional clarification and resolution would be helpful in the administration of the Act by the Board staff**.**

**B.**    (i.) In a previous sunset review, across-the-board language was added to the Veterinary Licensing Act in Section 801.153 of the Texas Occupations Code, regarding the Board may not include in a rule regarding prohibiting a false, misleading, or deceptive practice a rule that restricts the person's advertisement under a trade name. This language has allowed, in at least one example the Board is aware of, a licensee to make their trade name a misleading name. The Board staff has spoken with Sunset staff and have been informed this across-the-board language is no longer a recommendation. This language allows licensees to name their businesses in a misleading manner which is not beneficial to the citizens of Texas.

(ii.) In Section 801.401 of the Texas Occupations Code, the statutory language sets out the disciplinary powers of the Board. In listing the powers, the powers are delimited by a comma and has "or" at the end of the list. It is clearly the intention of the legislature to allow the Board to use multiple of these powers in disciplining licensees. The suggested change is to add "and/or" at the end of subsection (4) to clarify the intended meaning of the legislature.

(iii.) Also, in Section 801.401 of the Texas Occupations Code, the Board believes it would be beneficial to have the ability under the disciplinary powers of the Board, to be able to order a licensee to take the jurisprudence exam. The Board's common practice is to offer this as a portion of an agreed disciplinary order. However, if the licensee does not agree to it and goes through a contested case hearing at SOAH, neither the Board nor the SOAH judge has the authority to order a jurisprudence exam as part of a disciplinary order. It is sometimes quite apparent that the licensee was highly uninformed of the requirements in the Veterinary Licensing Act and/or Board rules which directly lead to the violation of the Act and/or rules. In those scenarios, it would be helpful to have the licensee study the Act and rules and be tested on their knowledge. This is helpful to prevent further violations of the Act and rules by the licensee.

(iv.) The Board is receiving more complaints in the past few years where licensed veterinarians are stating that they will euthanize a client's animal and accept payment to do so and instead, treat the underlying medical issue for free and rehome the animal, often to an employee. In these scenarios, there is no paperwork from the client understanding that euthanasia is not going to occur and the animal may be rehomed. This is just one example of ethical issues that are now presenting themselves in the veterinary profession. The Board believes that a requirement of a

minimal amount of ethics continuing education [such as 3 hours] would help veterinary licensees identify and avoid some of the ethical dilemmas that present themselves in the veterinary profession. Many other professions have a similar requirement of ethics continuing education (e.g. nurses, physical and occupational therapists, attorneys, and physicians).

(v.) In Section 801.253(b) of the Texas Occupations Code, there is an antiquated requirement that the Board publish information in newspapers or periodicals regarding licensing examinations. This requirement was set out prior to the internet and the Board's website. The Board sets out dates for licensing examinations on the Board website and in the periodical Board Notes sent out to all licensees who have provided an email address. (73% of licensee population) This requirement no longer serves its intended purpose as there are other more cost effective and useful ways to inform potential licensees of the dates for licensing examinations.

(vii.) In Section 801.004(6) of the Texas Occupations Code, there is an incorrect reference to Chapter 829 of the Health and Safety Code. The statute should reference Chapter 821 of the Health and Safety Code. This change would provide greater clarity to the public and any animal shelter employee that performs euthanasia who wishes to understand how to be exempt from the Veterinary Licensing Act.

## X.  Other Contacts

**A.  Fill in the following charts with updated information on people with an interest in your agency, and be sure to include the most recent email address.**

**Texas State Board of Veterinary Medical Examiners**
**Exhibits 15a – 15c: Contacts**

*Interest Groups*

| Group or Association Name/ Contact Person | Address | Telephone | Email Address |
|---|---|---|---|
| Texas Veterinary Medical Association/Chris Copeland | 8104 Exchange Dr. Austin, TX 78754 | 512-452-4224 | ccopeland@tvma.org |
| Texas Association of Registered Veterinary Technicians /Sue Allen, LVT | 2317 N. 44th St. Waco, TX 76710 | 254-399-0389 | sarvt1981@yahoo.com sueallen@tarvt.org |
| IAED/Josh Wallace | P.O. Box 498 Whitesboro, TX 76273 | (405) 313-8570 | wallacejosh@hotmail.com |
| Equine Dental Providers of America/Carl Mitz | 4836 Gaskamp Rd Washington, TX 77880 | 979-836-1015 | mitzequine@aol.com |
| Texas Vet Board Watch/Greg Munson | 2202 Norma Dr. Mesquite, TX 75149 | 972-284-9654 | munson@stempy.net |
| Vet Abuse Network/ Julie Catalano | PO Box 6136 San Antonio, TX 78209 | 210-216-4102 | info@vetabusenetwork.com |

| Group or Association Name/ Contact Person | Address | Telephone | Email Address |
|---|---|---|---|
| Texas Farm Bureau /Vernie Glasson, Executive Director | P.O. Box 2689 Waco, Texas 76702 | 254-772-3030 | vglasson@txfb.org |
| Texas and Southwestern Cattle Raisers Association /Matt Brockman | 1301 W. Seventh St. Fort Worth, Texas 76102 | 817/332-7064 Ext. 101 | mbrockman@texascattleraisers.org |
| Tiger's Justice Team / Zandra Anderson | 7941 Katy Freeway #412 Houston, Texas 77024 | 713/222-7600 | TexasDogLawyer@yahoo.com |

*Exhibit 15a:  Contacts – Interest Groups*

## Interagency, State, or National Associations

| Group or Association Name/ Contact Person | Address | Telephone | Email Address |
|---|---|---|---|
| American Association of Veterinary State Boards/ Dr. John Lawrence | 380 West 22nd Street, Ste. 101 Kansas City, MO 64108 | (816) 931-1504 | president@aavsb.org |
| Texas Veterinary Medical Association/Chris Copeland | 8104 Exchange Dr. Austin,  TX  78754 | 512-452-4224 | ccopeland@tvma.org |
| National Board of Veterinary Medical Examiners/ Heather Case, D.V.M. | P.O. Box 1356 Bismarck, ND 58502 | 701-224-0332 | case@nbvme.org |
| SPCA of Texas/ James Bias, CAWA | 2400 Lone Star Dr. Dallas, TX 75212 | 214-742-7722 | spca@spca.org |

*Exhibit 15b:  Contacts – Interagency, State, and National Association*

## Liaisons at Other State Agencies

| Agency Name / Relationship / Contact Person | Address | Telephone | Email Address |
|---|---|---|---|
| Legislative Budget Board, Assigned Analyst/Trevor Whitney | Robert E. Johnson Bldg., 5th Floor 1501 N. Congress Austin, TX  78701 | (512) 463-8203 | Trevor.Whitney@lbb.state.tx.us |

| Agency Name / Relationship / Contact Person | Address | Telephone | Email Address |
|---|---|---|---|
| Office of the Attorney General/Agency Assigned Attorney/Andrew Lutostanski | Administrative Law Division P.O. Box 12548 Austin, TX 78711-2548 | (512) 475-4200 | andrew.lutostanski@texasattorneygeneral.gov |
| Office of the Attorney General/Agency Assigned Attorney/Ted Ross | Administrative Law Division P.O. Box 12548 Austin, TX 78711-2548 | (512) 475-4191 | ted.ross@texasattorneygeneral.gov |
| Office of the Governor/Governor Liaison/Ryan Vise | 1100 San Jacinto Austin, TX 78701 | (512) 475-3547 | ryan.vise@gov.texas.gov |
| Texas Animal Health Commission/Gene Snelson | 2105 Kramer Austin TX 78758 | (512) 719-0722 | gsnelson@tahc.state.tx.us |
| Texas Department of State Health Services/Karen Tannert | PO Box 149347 Austin, TX 78714-9347 | (512) 834-6755 x2350 | karen.tannert@dshs.state.tx.us |
| Texas Department of State Health Services/Dr. Tom Sidwa | Infectious Disease Control Unit Mail Code: 1960 PO BOX 149347 Austin, TX 78714-9347 | (512) 458-7111 x6628 | Tom.Sidwa@dshs.state.tx.us |
| Texas Racing Commission/Mark Fenner | 8505 Cross Park, #110 Austin, TX 78754 | (512) 490-4009 | mark.fenner@txrc.state.tx.us |
| Texas Department of Public Safety/Sherry Wright | PO Box 4087 Austin TX 78773-0542 | (512) 424-7568 | Sherry.Wright@dps.texas.gov |
| Drug Enforcement Administration (DEA)/Mark Schilli | | | mark.e.schilli@usdoj.gov |
| Texas Board of Chiropractic Examiners/Bryan Snoddy | 333 Guadalupe, Ste. 3-825 Austin, TX 78701 | (512) 305-6715 | bryan.snoddy@tbce.texas.gov |

**Exhibit 15c:  Contacts – Liaisons at Other State Agencies**

# XI. Additional Information

## A. Agency-Specific Reports

This is not applicable as our Board is not required to complete any agency-specific reports that are not part of general reporting requirements applicable to all agencies.

**B.    Has the agency implemented statutory requirements to ensure the use of "first person respectful language"?  Please explain and include any statutory provisions that prohibits these changes.**

The Board's statutes and rules comply with the statutory requirements for the use of "first person respectful language."

**C.    Fill in the following chart detailing information on complaints regarding your agency. Do not include complaints received against people or entities you regulate.  The chart headings may be changed if needed to better reflect your agency's practices.**

The Board does not have a formal process for receiving and acting upon complaints against the Board.  Such complaints usually arise after the resolution of a complaint against a veterinarian where one of the parties is not happy with the result.  The complaint may then be: "The Board favors the veterinarians," "The complaint took too much time," "The Board over-regulates veterinarians," etc. Several persons complain regularly about the Board.  Their e-mails and other communications are responded to when appropriate.

As required by SB1563 (76th Legislature), the Board conducts a customer service survey related to each of the Board's strategies listed in the appropriations act.  The results of the survey are reviewed by Board staff and utilized to improve Board services.  The results are then filed with the Governor's office of Budget and Planning and the Legislative Budget Board.

The last customer satisfaction survey was completed in May 2014.  Surveys were distributed to all licensees and complainants for whom the Board has an email address [73 % of the licensee population], and a link was also provided on the Board website and Facebook page.  The survey included questions related to licensure, enforcement, the Board website, and communication with the Board; 306 individuals responded.  This survey report is included as Attachment 12.

**D. Fill in the following charts detailing your agency's Historically Underutilized Business (HUB) purchases.**

**Texas State Board of Veterinary Medical Examiners**
**Exhibits 16a – 16c:  Purchases from HUBs**

*Fiscal Year 2013*

| Category | Total $ Spent | Total HUB $ Spent | Percent | Statewide Goal |
|---|---|---|---|---|
| Heavy Construction | $0 | $0 | n/a | 11.2% |
| Building Construction | $0 | $0 | n/a | 21.1% |
| Special Trade | $198 | $0 | 0% | 32.7% |
| Professional Services | $3,964 | $3,964 | 100% | 23.6% |
| Other Services | $60,777 | $25,699 | 42.28% | 24.6% |
| Commodities | $11,047 | $8,272 | 74.88% | 21.0% |
| *TOTAL* | $75,987 | $37,936 | 49.92% | |

*Exhibit 16a:  HUB Purchases for FY 2013*

*Fiscal Year 2014*

| Category | Total $ Spent | Total HUB $ Spent | Percent | Statewide Goal |
|---|---|---|---|---|
| Heavy Construction | $0 | $0 | n/a | 11.2% |
| Building Construction | $0 | $0 | n/a | 21.1% |
| Special Trade | $0 | $0 | n/a | 32.7% |
| Professional Services | $0 | $0 | n/a | 23.6% |
| Other Services | $46,983 | $6,666 | 14.19% | 24.6% |
| Commodities | $32,149 | $23,032 | 71.64% | 21.0% |
| *TOTAL* | $79,133 | $29,698 | 37.53% | |

*Exhibit 16b:  HUB Purchases for FY 2014*

*Fiscal Year 2015*

| Category | Total $ Spent | Total HUB $ Spent | Percent | Statewide Goal |
|---|---|---|---|---|
| Heavy Construction | $0 | $0 | n/a | 11.2% |
| Building Construction | $0 | $0 | n/a | 21.1% |
| Special Trade | $0 | $0 | n/a | 32.7% |
| Professional Services | $0 | $0 | n/a | 23.6% |
| Other Services | $17,139 | $1,178 | 6.87% | 24.6% |
| Commodities | $9,295 | $834 | 8.97% | 21.0% |
| *TOTAL* | $26,434 | $2,012 | 7.61% | |

*Exhibit 16c:  HUB Purchases for FY 2015*

**E.    Does your agency have a HUB policy?  How does your agency address performance shortfalls related to the policy?  (Texas Government Code, Sec. 2161.003; TAC Title 34, Part 1, rule 20.15b)**

Yes, our Board has a HUB policy. When a shortfall in HUB purchases is evident the data is examined to find out why there is a shortfall.  The purchasing department is held to strict procedures that are formulated from the foundation of the State of Texas procurement rules and statutes.

The majority of our purchases are small dollar amounts, for example the mid-year report for FY 2015 shows 33 purchases under $1,000 and 7 purchases over $1,000.  In the group of 7 purchases that are over $1,000 there are 3 purchases that are over $2,000 and the sum of these 3 purchases ($21,840.93) are 4 times greater than the sum of the 4 purchases from $1,000 to $1,999 ($4,962.30).  The 3 larger purchases were obtained through DIR contracting services, the Council on Competitive Government and one was an open market bid.  These costs have been consistent from FY2013-FY2015, however the quantity of smaller purchases is declining due to the implementation of more streamlined processes throughout the Board.

HUB purchases, DIR contracts, TXSmartbuy and Council on Competitive Government are the majority of the Board's purchases and a vendor being a HUB is always checked, if an item is available to buy from a HUB vendor then that is the priority for the purchase.

**F.    For agencies with contracts valued at $100,000 or more:  Does your agency follow a HUB subcontracting plan to solicit bids, proposals, offers, or other applicable expressions of interest for subcontracting opportunities available for contracts of $100,000 or more? (Texas Government Code, Sec. 2161.252; TAC Title 34, Part 1, rule 20.14)**

This is not applicable to our Board as we do not have contracts that are valued at $100,000 or more.

**G.    For agencies with biennial appropriations exceeding $10 million, answer the following HUB questions.**

This is not applicable to our Board as we do not have biennial appropriations exceeding $10 million.

**H.** **Fill in the charts below detailing your agency's Equal Employment Opportunity (EEO) statistics.**

**Texas State Board of Veterinary Medical Examiners**
**Exhibits 17a – 17d: Equal Employment Opportunity Statistics FY2013-2015**

### 1. Officials / Administration

| Year | Total Number of Positions | Percent African-American | Statewide Civilian Workforce Percent | Percent Hispanic | Statewide Civilian Workforce Percent | Percent Female | Statewide Civilian Workforce Percent |
|---|---|---|---|---|---|---|---|
| 2013 | 1 | 0% | 8.99% | 0% | 19.51% | 100% | 39.34% |
| 2014 | 1 | 0% | 8.99% | 0% | 19.51% | 100% | 39.34% |
| 2015 | 1 | 0% | 8.99% | 0% | 19.51% | 100% | 39.34% |

*Exhibit 17a: EEO Statistics for Officials/Administration*

### 2. Professional

| Year | Total Number of Positions | Percent African-American | Statewide Civilian Workforce Percent | Percent Hispanic | Statewide Civilian Workforce Percent | Percent Female | Statewide Civilian Workforce Percent |
|---|---|---|---|---|---|---|---|
| 2013 | 6 | 0% | 11.33% | 0% | 17.4% | 83% | 59.14% |
| 2014 | 6 | 0% | 11.33% | 0% | 17.4% | 83% | 59.14% |
| 2015 | 6 | 0% | 11.33% | 0% | 17.4% | 100% | 59.14% |

*Exhibit 17b: EEO Statistics for Professionals*

### 3. Para-Professional

| Year | Total Number of Positions | Percent African-American | Statewide Civilian Workforce Percent | Percent Hispanic | Statewide Civilian Workforce Percent | Percent Female | Statewide Civilian Workforce Percent |
|---|---|---|---|---|---|---|---|
| 2013 | 5 | 0% | 14.16% | 20% | 21.36% | 40% | 41.47% |
| 2014 | 5 | 0% | 14.16% | 0% | 21.36% | 40% | 41.47% |
| 2015 | 5 | 20% | 14.16% | 0% | 21.36% | 80% | 41.47% |

*Exhibit 17c: EEO Statistics for Para-Professional*

### 4. Administrative Support

| Year | Total Number of Positions | Percent African-American | Statewide Civilian Workforce Percent | Percent Hispanic | Statewide Civilian Workforce Percent | Percent Female | Statewide Civilian Workforce Percent |
|---|---|---|---|---|---|---|---|
| 2013 | 4 | 0% | 13.57% | 25% | 30.53% | 100% | 65.62% |
| 2014 | 6 | 16.67% | 13.57% | 33.33% | 30.53% | 100% | 65.62% |
| 2015 | 6 | 16.67% | 13.57% | 33.33% | 30.53% | 100% | 65.62% |

*Exhibit 17d: EEO Statistics for Administrative Support*

**I.  Does your agency have an equal employment opportunity policy?  How does your agency address performance shortfalls related to the policy?**

Our Board does have an equal employment opportunity policy which establishes a framework to ensure that all facets of employment, including recruitment, selection, assignment, training, promotion, and compensation are based on job-related factors such as an individual's education, qualifications, experience, demonstrated abilities and job performance.

Issues related to the equal employment opportunity policy are addressed in the Board's affirmative action plan as set forth by the Civil Rights Division of the Texas Workforce Commission.

# XII. Agency Comments

We look forward to the Sunset Advisor Commission team's visit to provide the information needed to make a thorough assessment of our Board's operations.

# Attachments

_____

1. Veterinary Licensing Act
2. Board Notes – FY2014 – 2015
   a. Fall-Winter 2013
   b. Spring-Summer 2014
   c. Fall-Winter 2014
3. Publications and Brochures
4. Board Member Biographical Information
   a. Bud E. Alldredge, Jr., DVM
   b. Janie Carpenter, DVM
   c. Dan Craven, DVM
   d. J. Todd Henry, DVM
   e. Joe Mac King, DVM
   f. Roland Lenarduzzi, DVM
   g. James "Jim" McAdams
   h. Keith Pardue
   i. Chad Upham
5. Board Rules
6. Legislative Appropriations Request FY2016 – 2017
7. Annual Financial Reports – FY2012 – 2014
   a. FY2012
   b. FY2013
   c. FY2014
8. Operating Budget – FY2103 – 2015
9. Quarterly Performance Reports – FY2012 – 2015
   a. FY2012
   b. FY2013
   c. FY2014
   d. FY2015 (*this will be a supplemental report*)
10. Strategic Plan
11. July 2011 Audit Report on Performance Measures
12. 2014 Customer Service Survey
13. Policy on Division of Responsibilities Between Board and Staff
14. Policy on Use of Technological Solutions to Improve Board Functions
15. Regular License Flowchart
16. Provisional License Flowchart
17. Special License Flowchart

# EXHIBIT B

# EWELL | BROWN | BLANKE

Ewell, Brown & Blanke LLP
111 Congress Avenue
28th Floor
Austin, Texas 78701

Direct: 512.770.4011
Mobile: 512.913.2978
Fax:　877.851.6384

dblanke@ebblaw.com

November 6, 2015

**By Email**

Mr. Ted A. Ross
Assistant Attorney General
Office of the Attorney General
300 West 15th Street
Austin, TX 78701
ted.ross@texasattorneygeneral.gov

Re:　*Texas Board of Veterinary Medical Examiners, et al. v. Jefferson*; No. 03-14-00774-CV

Dear Ted:

We have read Appellants'/Cross-Appellees' Suggestion of Mootness.

The Board relies upon *Bexar Metro Water Dist. v. City of Bulverde*, 234 S.W.3d 126 (Tex. App.—Austin 2007, pet. denied), and is therefore aware that "a declaratory judgment action is not moot when a party voluntarily abandons the conduct at issue *without any binding admission or extrajudicial action that would prevent a recurrence of the challenged action.*" *Id.* at 131 (internal quotations omitted) (emphasis added).

To satisfy the requirement for a binding admission or extrajudicial action, we have drafted the attached covenants. Please understand that this is an initial draft; we are not inflexible on the precise wording so long as the result is sufficient to "prevent a recurrence of the challenged action." *Id.*

Given the time constraints for Dr. Jefferson's response to the Suggestion of Mootness, please let us know as soon as possible whether the Board is amenable to an agreement along the lines of the attached covenants.

We look forward to hearing from you.

Very truly yours,

David P. Blanke

Encl.

c:      David F. Brown
        Ryan Clinton
        Martha S. Dickie
            *(all by email w/encl.)*

# THE TBVME'S COVENANT NOT TO PROSECUTE AND DR. JEFFERSON'S COVENANT TO OPERATE SAPA AS A RELEASING AGENCY

These covenants are made and entered into as of November 5, 2015 (the *Effective Date*), by and between the Texas Board of Veterinary Medical Examiners (the *TBVME*) and Ellen Jefferson, D.V.M. (*Dr. Jefferson*).

WHEREAS, San Antonio Pets Alive! (*SAPA*) is a Texas non-profit corporation operating as a "releasing agency" under Chapter 828 of the Texas Health and Safety Code.

WHEREAS, SAPA owns the animals it rescues from the City of San Antonio's Animal Care Services (*ACS*).

WHEREAS, Dr. Jefferson has been SAPA's Executive Director, and she remains its Lead Veterinarian and a member of its Board of Directors.

WHEREAS, Dr. Jefferson is therefore an agent of SAPA and "designated caretaker" under Section 801.004(1) of the Texas Occupations Code.

WHEREAS, Dr. Jefferson's treatment or care of SAPA-owned animals is treatment or care by the owner of the animal or "designated caretaker" of the animal;

WHEREAS, Dr. Jefferson organized SAPA to operate as a "releasing agency," within the meaning of Section 828.001(2) of the Texas Health and Safety Code, and her intent remains to operate it as such.

WHEREAS, the intent to operate a "releasing agency" is not "intent to violate" Chapter 801 of the Texas Occupations Code, as proscribed in Section 801.004(1).

WHEREAS, Section 801.004(1) of the Texas Occupations Code exempts SAPA's and Dr. Jefferson's "treatment or care" of SAPA-owned animals from the TBVME's jurisdiction.

WHEREAS, Board Rule 573.72 provided as follows:

(a) A nonprofit or municipal corporation may employ or contract with a veterinarian to provide veterinary services in connection with sheltering, sterilization, vaccination, or other medical care and treatment of animals.

(b) Employment by or contractual service to a nonprofit or municipal corporation does not exempt the veterinarian from any of the provisions of the Veterinary Licensing Act or the Board's rules.

(c) Veterinarians employed by, or contracted to, nonprofit or municipal corporations shall be liable for any violations of the Act or rules occurring as a result of the practice of veterinary medicine or any veterinary services provided by the nonprofit or municipal corporation, including those occurring due to the acts or omissions of non-licensed employees of, or volunteers for, the nonprofit or municipal corporation.

WHEREAS, Board Rule 573.80(2) defined "designated caretaker" as follows:

Designated caretaker—a person to whom the owner of an animal has given specific authority to care for the animal and who has not been designated, by using the pretext of being a designated caretaker, to circumvent the Veterinary Licensing Act (Chapter 801, Texas Occupations Code) by engaging in any aspect of the practice of veterinary medicine (including alternate therapies). A designated caretaker who treats an animal for a condition that the animal was known or suspected of having prior to the person being named a designated caretaker, is presumed to be attempting to circumvent the Veterinary Licensing Act unless the designated caretaker is following the instruction of a veterinarian and is under the appropriate level of supervision per board rules. In this situation, the designated caretaker may present evidence to rebut the presumption.

WHEREAS, pursuant to Section 2001.038 of the Administrative Procedure Act, the Final Judgment (Nov. 14, 2014), in *Jefferson v. Texas State Board of Veterinary Medical Examiners*, No. D-1-GN-14-000287, 127th Judicial District Court for Travis County, Texas (Hon. Gisela D. Triana presiding) decreed that Board Rules 573.72 and 573.80(2) are "contrary to Section 801.004(1) of the Veterinary Practice Act and therefore invalid."

WHEREAS, the TBVME has dismissed its claims in *Texas Board of Veterinary Medical Examiners v. Ellen Jefferson, D.V.M.*, SOAH Docket No. 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, with prejudice.

WHEREAS, the TBVME has closed its pending investigations of Dr. Jefferson and SAPA and advised that it will take no further actions with respect thereto.

NOW, THEREFORE, in consideration of the above premises and mutual covenants hereinafter contained, the TBVME and Dr. Jefferson agree as follows:

2

1.	**TBVME's Covenant**. The TBVME covenants not to (a) take disciplinary action or prosecute disciplinary charges against Dr. Jefferson for the treatment or care of a SAPA-owned animal in any manner by her, an employee of SAPA, or a SAPA designated caretaker, or (b) apply Board Rules 573.72 and 573.80(2) to Dr. Jefferson, an employee of SAPA, or a volunteer of SAPA. *See* TEX. OCC. CODE § 801.004(1) ("This chapter does not apply to: (1) the treatment or care of an animal in any manner by the owner of the animal, an employee of the owner, or a designated caretaker of the animal, unless the ownership, employment, or designation is established with the intent to violate this chapter").

2.	**Dr. Jefferson's Covenant**. Dr. Jefferson covenants to (a) limit SAPA's treatment and care of animals (including her treatment and care) to those owned by SAPA, and/or (b) otherwise comply with Chapter 828 of the Texas Health and Safety Code, including (without limitation) the surgery requirements and veterinary services limitations in Section 828.012 thereof. *See* TEX. HEALTH AND SAFETY CODE § 828.012 ((a) Surgery or nonsurgical sterilization performed in accordance with this chapter must be performed by a veterinarian or a full-time student of an accredited college of veterinary medicine as provided by Chapter 801, Occupations Code. (b) A veterinarian employed by a releasing agency may not perform nonemergency veterinary services other than sterilization on an animal that the releasing agency knows or should know has an owner. However, this subsection does not prevent a veterinarian employed by a releasing agency from performing veterinary services on an animal whose owner is indigent.").

3.	**Attorneys' Fees**. If any lawsuit is brought to enforce any term or provision of these covenants, or in connection with any dispute arising from or relating to these covenants or to the alleged breach of these covenants, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs incurred in connection with any such lawsuit or proceeding, throughout trial and all appeals.

4.   **Governing Law and Venue**. The foregoing covenants shall be governed by, enforced under, and construed in accordance with the laws of the State of Texas. Venue for any action or proceeding relating thereto shall lie exclusively in the state courts in Travis County, Texas.

5.   **Counterparts**.  These covenants may be executed in multiple counterparts, each of which will be deemed to be an original, but all of which together will constitute but one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this covenant on the date and year first above written.

_____
Nicole Oria
State Bar No. 24002118
Executive Director
Texas Board of Veterinary Medical Examiners
William P. Hobby, Jr. Building, Suite 3-810
333 Guadalupe Street
Austin, TX 78701
512.305.7555
512.305.7556 (fax)

_____     _____
Bud Alldredge, D.V.M.                Roland Lenarduzzi, DVM
President                            Vice-President
Texas Board of Veterinary Medical Examiners     Texas Board of Veterinary Medical Examiners

_____     _____
Dan Craven, DVM,                     Janie Carpenter, DVM
Secretary                            Board Member
Texas Board of Veterinary Medical Examiners     Texas Board of Veterinary Medical Examiners

_____
J. Todd Henry, D.V.M.
Board Member
Texas Board of Veterinary Medical Examiners

_____
James McAdams
Board Member
Texas Board of Veterinary Medical Examiners

_____
Keith Pardue
Board Member
Texas Board of Veterinary Medical Examiners

_____
Chad Upham
Board Member
Texas Board of Veterinary Medical Examiners

_____
Ellen Jefferson, D.V.M.

# EXHIBIT C

**From:** Ross, Ted <Ted.Ross@texasattorneygeneral.gov>
**Sent:** Monday, November 16, 2015 10:52 AM
**To:** David Blanke
**Cc:** Ryan D. Clinton; David Brown; Nicole Oria (nicole.oria@tbvme.state.tx.us) (nicole.oria@tbvme.state.tx.us); Maggie Griffith; Lutostanski, Andrew
**Subject:** RE: TBVME v. Jefferson

David,

I have consulted with Board staff about the proposed covenants. Board Staff is of the sense that they are overly broad and that a continuance of the oral argument for the purpose of a board meeting would not be useful.

As for the SOAH case, we will want to see Dr. Jefferson's response to the Suggestion of Mootness and have the opportunity to file a reply.

Finally, as I stated earlier, I have no objection to a reasonable continuance of today's deadline for filing Dr. Jefferson's response to the Board's Suggestion of Mootness. How much time do you need? We need to keep in mind the fact that next week is a short week because of the Thanksgiving holiday.

Thanks.

**From:** David Blanke [mailto:dblanke@ebblaw.com]
**Sent:** Monday, November 16, 2015 10:12 AM
**To:** Ross, Ted
**Cc:** Ryan D. Clinton; David Brown; David Blanke
**Subject:** TBVME v. Jefferson

Ted:

We'd like to take you up on the offered extension on responding to the Board's suggestion of mootness. Any notion when you will have further word on the other SAPA case and the draft covenants? I'm just looking to avoid an extension that is needlessly long as well as one that is impossibly short.

Thanks.

DPB

**EWELL | BROWN | BLANKE**

David P. Blanke
Ewell, Brown & Blanke LLP
111 Congress Avenue, 28th Floor
Austin, Texas 78701
512.770.4011 (direct)
512.913.2978 (mobile)
877.851.6384 (fax)

# EXHIBIT D

**From:** David Blanke
**Sent:** Tuesday, November 10, 2015 9:48 AM
**To:** Ted Ross (Ted.Ross@texasattorneygeneral.gov)
**Cc:** Ryan D. Clinton; David Brown
**Subject:** TBVME v. Jefferson

Ted:

Thanks for the time this morning. I am writing to follow up with information about the other SAPA-related case: The respondent's name is Christina E. Noltenius, D.V.M., and the case number is 578CP14000522.

Best regards,

DPB


**EWELL | BROWN | BLANKE**

David P. Blanke
Ewell, Brown & Blanke LLP
111 Congress Avenue, 28th Floor
Austin, Texas 78701
512.770.4011 (direct)
512.913.2978 (mobile)
877.851.6384 (fax)
dblanke@ebblaw.com